IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 16-3024-01-CR-S-MDH |
| | ) | |
| SAFYA ROE YASSIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO DISMISS INDICTMENT

COMES NOW Defendant, Safya Roe Yassin ("Defendant"), and moves this Honorable Court, pursuant to Fed. R. Crim. P. 12(b)(3) to dismiss the Indictment in this case based upon the following:

## SUGGESTIONS

## I.    BACKGROUND AND LEGAL STANDARDS

Defendant moves this Court for an Order dismissing the Indictment in the instant case.  Ms. Yassin moves to dismiss the indictment on four bases.  First, the Indictment fails to state an offense because the charged communications alleged to be threats in the indictment do not constitute "true threats."  Second, the Indictment fails to state an offense because it does not allege that Ms. Yassin subjectively [*herself*] intended to convey a present or future "true threat" to injure the person of another. Third, 18 U.S.C. § 875(c), which prohibits the knowing transmission of any communication containing "any threat to injure the person of another," is unconstitutionally overbroad, as the law proscribes a substantial amount of speech protected by the First Amendment.  Fourth, the law is

unconstitutionally vague, because it fails to put a reasonable person on notice as to what speech the statute proscribes.

On February 23, 2016, a grand jury in the Western District of Missouri returned a one-count Indictment charging that Ms. Yassin violated 18 U.S.C. § 875(c) and 2, by knowingly transmitting in interstate commerce:

> a communication containing a threat to injure the person of another, that is, a communication with the explicit phrase "Wanted to kill" followed by the first and last name, status as an employee of the Federal Bureau of Investigation, city of residence, zip code, and phone number of Victim 1, and then, in the same communication, repeated the same explicit "Wanted to kill" phrase followed by the first and last name, status as an employee of the Federal Bureau of Investigation, city of residence, zip code, and phone number of Victim 2.

Noticeably, there is nothing in these allegations that attributes such statement to Defendant, nor that Defendant intends such to be attributed to her or an action to be taken by her as part of such alleged threat.

### A. Due Process Clause of the Fifth Amendment to the United States Constitution.

The Due Process Clause of the Fifth Amendment to the United States Constitution requires that a statute clearly delineate the conduct which it intends to prohibit. *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972). A party may raise a vagueness challenge by arguing either that a statute is vague "as applied" to the facts at hand, or that a statute is void on its face. An "as applied" challenge asks whether the defendant "received fair warning of the criminality of her own conduct from the statute in question[.]" *Parker v. Levy,* 417 U.S. 733, 756 (1974).

2

Statutes must provide "fair warning" about the conduct that will trigger liability: a penal statute is unconstitutionally vague if a person of ordinary intelligence cannot tell from reading the statute what conduct is proscribed so that she may avoid breaking the law. *Karlin v. Foust,* 188 F.3d 446, 458 (7th Cir. 1999); *Grayned,* 408 U.S. at 108-109 (by failing to clearly define prohibited conduct "[v]ague laws may trap the innocent by not providing fair warning [and may] . . . impermissibly delegate basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application").

As the Seventh Circuit noted in *Karlin,* the "Constitution tolerates a lesser degree of vagueness in enactments 'with criminal rather than civil penalties because the consequences of imprecision' are more severe." 188 F.3d at 458-59 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498 (1982)). "The purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law. 'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.'" *City of Chicago v. Morales,* 527 U.S. 41, 58 (1999) (*citing Lanzetta v. New Jersey,* 306 U.S. 451, 453 (1939)).

In the Indictment, the government was not willing or was unable to identify the entirety of the circumstances of the alleged conduct by Defendant about which they are complaining. They incomprehensively describe the alleged threat as the phrase "Wanted to kill." Such is not even grammatically understandable or able to convey any coherent meaning as a true threat, let alone be understood as to its meaning. Moreover, it is merely

3

alleged that Ms. Yassin "transmitted" such alleged communication. There is no allegation that such phrase was the original statement of the Defendant, nor is there anything alleged in the Indictment other than a mere conclusory statement that the Defendant intended any act herself in relation to the alleged communication. The lack of clarity in the alleged statement and the failure to allege that Defendant [*herself*] had the requisite mens rea to intend any action related to a wrongdoing is insufficient to identify an alleged offense. *See*, *Elonis v. United States*, 135 S.Ct. 2001, 192 L.Ed.2d 1, 83 USLW 4360 (2015).

### B.  The Statute.

The statute charged herein, 18 U.S.C. § 875(c), proscribes the following: "Whoever transmits in interstate of foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

The Eighth Circuit's Model Criminal Jury Instructions do not include a standard instruction for the elements of 18 U.S.C. § 875(c). Instructions for such statute are however set forth in the Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Offense Instruction 30.3 (2010):

> The Defendant can be found guilty of this crime only if the Government proves beyond a reasonable doubt that the Defendant knowingly sent a message in [interstate] [foreign] commerce containing a true threat [to kidnap any person] [to injure the person of another].
> [To transmit something in "interstate commerce" means to send it from a place in one state to a place in another state.]
> [To transmit something in "foreign commerce" means to send it from a place in the United States to anyplace outside the United States.]
> A "true threat" is a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would lead

4

a reasonable person to believe that the Defendant intended to [kidnap] [injure] another person.
The heart of the crime is intentionally sending a true threat in interstate or foreign commerce. The Government doesn't have to prove that the Defendant intended to carry out the threat.

In analyzing the above required elements, a significant legal issue in this case is whether the communications Ms. Yassin allegedly retweeted on Twitter fall within the very narrow "true threats" exception to the broad protections of the First Amendment or whether they are, instead, in the much broader, presumed category of protected speech. Additionally, whether as a matter of law if someone is alleged to have posted [published] another person's statement for the public to view does that have the mens rea required under current law for *that person* to be held accountable under the statute. For the reasons discussed below, it is clear that none of the alleged communications set forth in the indictment constitute "true threats" and they are, therefore, protected speech under the First Amendment.

As important to note as to the Eleventh Circuit's jury instruction is that the "reasonable person" standard used is no longer valid or constitutional. In the recent U.S. Supreme Court case of *Elonis v. United States*, 135 S.Ct. 2001, 2014, 192 L.Ed.2d 1, 83 USLW 4360 (2015)[1], the Court eliminated that as a proper standard in evaluating a person's alleged conduct under this statute:

---

[1] *Elonis v. United States*, 135 S.Ct. 2001, 192 L.Ed.2d 1, 83 USLW 4360 (2015), in which the Court reversed the judgment of the Third Circuit Court of Appeals and remanded the case for further proceedings consistent with this opinion, which was effectuated by the judgment being vacated as to the defendant, Mr. Elonis.

5

The jury was instructed that the Government need prove only that a reasonable person would regard Elonis's communications as threats, and that was error. Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state. That understanding "took deep and early root in American soil" and Congress left it intact here: Under Section 875(c), "wrongdoing must be conscious to be criminal." Morissette, 342 U. S., at 252. There is no dispute that the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat.

As for this indictment, there is no stated threat in the communication of "Wanted to kill." The allegation does not even make a complete statement. It does not allege Ms. Yassin wanted to kill; there is no first person communication even alleged. The allegation itself is too vague to serve as a basis for the charge in the indictment. There is absolutely no language at all alleged that states a purpose by this Defendant to make a first person stated threat.

## II.     LEGAL ANALYSIS AND ARGUMENT

### A. The indictment fails to state an offense because the charged communications alleged in the indictment do not constitute "true threats."

Because the indictment in this case alleges that Ms. Yassin transmitted in interstate commerce communications containing a threat to injure the person of another in violation of 18 U.S.C. § 875(c), and § 875(c) criminalizes speech, it must be evaluated in accordance with protections of the First Amendment.

"[T]he bedrock principle underlying the First Amendment… is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also Snyder*

6

*v. Phelps*, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) finding that hurtful, controversial or upsetting speech can be protected. Indeed, the Supreme Court has declared that one of the gravest threats to First Amendment freedom of speech is a law that criminalizes protected speech. For example, it is well established that "the expression of racist and antisemitic views," are protected activities and may not be circumscribed by the state. *Nat'l Socialist White People's Party v. Ringers*, 473 F.2d 1010, 1015 (4th Cir. 1972). "The First Amendment commands, 'Congress shall make no law…abridging the freedom of speech.' The government may violate this mandate in many ways…but a law imposing criminal penalties on protected speech is a stark example of speech suppression." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002) (emphasis added; citations omitted).

Our constitutional tradition, however, has exempted certain narrowly defined categories of speech from that protection. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72. Among them are obscenity, fighting words, and "true threats." *Id.*; *Watts v. United States*, 394 U.S. 705 (1969). Those categories are unprotected, the Court has explained, because our history has deemed them to be "no essential part of any exposition of ideas, and [to be] of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky*, 315 U.S. at 572. Notwithstanding, "analysis of content restrictions must begin with a healthy respect for the truth that they are the most direct threat to the vitality of First Amendment rights." *Collin v. Smith*, 578 F.2d 1197, 1202 (7th Cir.), cert. denied, 439 U.S. 916 (1978) (emphasis added; citations omitted).

7

Ms. Yassin's alleged postings should be undoubtedly viewed as protected speech under the First Amendment. These postings do not constitute "true threats;" rather what is alleged is nothing more than an incomplete re-tweet [not stated in first person] of an incomplete, non-coherent communication. Also, the platforms that are alleged as the medium for the transmissions, the Internet or World Wide Web and Twitter, must also be considered.

### 1. First Amendment protection for speech on the Internet.

As this Court recognized nearly two decades ago, "[t]he Internet is a unique and wholly new medium of worldwide human communication." *Reno v. ACLU*, 521 U.S. 844, 850 (1997) (internal quotation marks and citation omitted). At that time, the Internet already provided "a wide variety of communication and information retrieval methods" that were "constantly evolving" and that, taken together, "constitute[d] a unique medium— known to its users as 'cyberspace'—located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet." *Id.* at 851.

For many people throughout the United States—indeed, the world—the Internet has become the predominant means for communication and public discourse. "This dynamic, multifaceted category of communication includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real time dialogue." Reno, 521 U.S. at 870. "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox.

8

Through the use of web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." *Id*.

In the United States, 74.8 percent of all households access the Internet at home in 2012, up from 18.0 percent in 1997 (when *Remo* was decided), and 45.3 percent of individuals 25 and older were using smartphones.[2]

Now, more than ever, "[t]he content on the Internet is as diverse as human thought." *Reno*, 521 U.S. at 870 (internal quotation marks and citation omitted). And, just as with offline speech, the types of content available "defy easy classification." *ACLU v. Reno*, 929 F. Supp. 824, 842 (E.D. Pa. 1996). Individuals can communicate with each other and the broader public through all manner of Internet based media, including email, chat rooms, direct messaging services, newsgroups, videos, blogs, websites, games, social networks such as Facebook, and remote hosting services for shared files. The ideas, opinions, emotions, actions, and desires capable of communication through the Internet are limited only by the human capacity for expression. If First Amendment protections are to enjoy enduring relevance in the twenty-first century, they must apply with full force to speech conducted online. As this Court made absolutely clear in Reno, there is "no basis for qualifying the level of First Amendment scrutiny that should be applied" to speech conducted on the Internet. *Reno*, 521 U.S. at 870.

---

[2] U.S. Census Bureau, *Computer and Internet Trends in America* (Feb. 3, 2014), http://www.census.gov/ hhes/computer/files/2012/ComputerUseInfographic _FINAL.pdf.

9

By design, social media facilitates the spread of information by encouraging the sharing of links, providing re-blogging or favoring tools that repost images or texts, and by making it easy to copy and paste content from one place to another.[3]  Finally, given the emergence of Internet search engines, people's online communications are searchable. Thus, "any inquisitive onlooker can query databases and uncover countless messages written by and about others."  *Id.*

Twitter, the platform allegedly serving as the medium for the threats alleged by the government, not only includes within its user interface the ability to "re-tweet" the speech of others to a potentially limitless audience of third- and fourth-degree contacts, but also has given rise to various online publishing tools that exist with the express purpose of empowering users to republish Twitter postings in a new and different context.

Among the most popular of these is Storify, a service that enables users to collect and publish Twitter users' "tweets" aggregated into a narrative created by the Storify accountholder, with or without the consent of the original speaker.[4]  *See* Patrick Sullivan, *The "Flickr" of An Idea: Apps Don't Necessarily Tell the Complete Digital Story*, The Nonprofit Times (Feb. 28, 2014) (explaining workings of Storify).  Thus, a Twitter user's harmless musing about a violent scene from a movie or television program could turn up,

---

[3] Danah Boyd, *IT'S COMPLICATED: THE SOCIAL LIVES OF NETWORKED TEENS* 11 (2014) (hereafter referenced as "IT'S COMPLICATED").
[4] *See* Patrick Sullivan, *The "Flickr" of An Idea: Apps Don't Necessarily Tell the Complete Digital Story*, THE NONPROFIT TIMES (Feb. 28, 2014) (explaining workings of Storify).

devoid of context, but attributed to its original author, in a published narrative that gives the remark ominous unintended meaning.

Likewise, Ms. Yassin's re-tweets are not stated in the first person, and are not even complete statements whereby a viewer could glean what is intended from such. Moreover, there is no first person stated intent or declaration on the part of Ms. Yassin that such incomplete thought be completed or carried out, and thus, cannot in such manner constitute a "true threat" within the First Amendment exception that the government will likely attempt to argue.

> ### 2. The indictment's allegations fail to allege the requisite mens rea required for the making of a threat for purposes of the statute and the First Amendment.

A "threat" is "a declaration of an intention or determination to inflict punishment, loss, or pain on another, or to injure another." Barron's Law Dictionary (3d ed.1991). Therefore, at the very least, the statute, as charged in Ms. Yassin' case, requires that the government prove that Ms. Yassin posted words that stated an intention ***by her*** to kill or inflict bodily harm on a particular individual or group of individuals. In addition, because statutes such as 18 U.S.C. § 875(c) punish pure speech, and therefore, carry the very real risk of impinging on speakers' First Amendment rights, the Supreme Court has consistently stated that they must be narrowly construed and applied. The First Amendment concerns in application of threat statutes therefore underlie the requirement that speech constitute a "true threat" before the speech can be punished.

The starting point for examination of the true threat requirement is *Watts*, *supra*, a case in which the Supreme Court examined the difference between true threats and protected speech in the context of 18 U.S.C. § 871, a statute with language very similar to the language of § 875(c).[5]

In *Watts*, the Supreme Court held, as a matter of law and contrary to the jury's verdict, that a young man's statement at a rally that "If they ever made me carry a rifle (referring to the draft) the first man I want to get in my sights is L.B.J." was not a "true threat" under § 871. The Court reasoned that, despite the government's legitimate interest in preventing the damaged caused by threatening words towards the President, the risk of curtailing speech prohibited the prosecution. "[A] statute . . . .which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." *Watts*, 394 U.S. at 707. The Court expressed "grave doubts" about the appellate courts' construction of the willfulness element as "an apparent willingness" to carry out the threat, although it did not decide what the willfulness element properly required. *Id.* at 707-08. It did, however, make clear that in addition to being willful, the words must constitute a "true threat" for the prosecution to be constitutional.

---

[5] Title 18 U.S.C. § 871 states, "Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President or Vice President-elect, shall be fined under this title or imprisoned not more than five year, or both."

"But whatever the "willfulness" requirement implies, the statute initially requires the Government to prove a true "threat." We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. For we must interpret the language Congress chose against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials."

*Id.* at 708 (internal quotations omitted).

Taken in context, the Court concluded that the defendant's words could **not** be interpreted as a true threat, as a *matter of law*, reversing his conviction. Likewise, there are no factual allegations of willingness to or an apparent willingness to carry out the any alleged threat that would demonstrate through allegations that a threat was intended on the part of the Ms. Yassin.

Unfortunately, the Supreme Court in *Watts* did not give the lower courts guidance as to the test for what constitutes a true threat. Commentators agree that the Supreme Court's true threats doctrine, and the First Amendment, require both that in context the words be reasonably understood as threats under an objective standard, and that the speaker intend them to be understood as threats made by them. *See generally* G. Robert Blakey and Brian J. Murray, *Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law*, 2002 B.Y.U. L. Rev. 829, 921-23 (2002) (hereinafter "Threats"); Jennifer E. Rothman, *Freedom of Speech and True Threats*, 25 Harv. J. L. & Pub. Pol'y 283, 295 (2001) (hereinafter "Freedom of Speech"). While the Court in Watts may not have given the lower courts explicit guidance in defining and applying the true threats doctrine, two later opinions clarify the Supreme Court's test. Moreover, unlike the tendency among the

13

lower courts to broaden the definition, the Supreme Court's approach continues to be strict and narrow in view of the important First Amendment interests involved.

First, in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), a number of white merchants brought suit following a boycott organized by members of the black community. The evidence showed that Charles Evers, field director for the NAACP and one of the defendants, made a number of speeches to large groups encouraging participation in the boycott, and his words were strong and, to many, frightening. For example, he told listeners that "'any uncle toms' who broke the boycott would 'have their necks broken' by their own people." *Id.* at 900 n.28. He told others that violators of the boycott would be "disciplined," and that "if we catch any of you going in any of them racist stores, we're gonna break your damn neck." *Id.* at 902. "Enforcers" were placed outside stores to see who violated the boycott, and their names were read aloud in meetings. *Id.* at 904. While the boycott was mostly peaceful, four violators of the boycott experienced violence including shots fired into their homes and a brick thrown threw another's windshield. The state courts upheld the finding of liability against the defendants.

The United States Supreme Court reversed. Emphasizing the importance of free speech under our constitution and in our society, the Court concluded that Evers' "did not exceed the bounds of protected speech." *Id.* at 929. Citing *Watts* in a footnote, the Court stated: "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite

14

lawless action, they must be regarded as protected speech. To rule otherwise would ignore 'the profound national commitment' that 'debate on public issues should be uninhibited, robust, and wide-open.'" 458 U.S. at 928 & n.71 (quoting *New York Times Co. v. Sullivan*, 376 U.S. __, 270 (19 )). Thus, Mr. Evers' words – including statements that people's necks would be broken – did not constitute "true threats" and therefore, were not actionable. *See also Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 773-74 (1994) (striking down those portions of lower court's ban on protests outside abortion clinic that prohibited display of certain posters and prohibited protesters from speaking to persons seeking clinic services within 300 feet of the clinic because prohibitions would bar both protected and unprotected speech); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) (striking down striking hate speech legislation used to prosecute cross-burning, and citing *Watts* for proposition that state can ban true threats of physical violence to president but not just content based threats).

Second, in 2003, the Supreme Court issued its decision in *Virginia v. Black*, 538 U.S. 343 (2003), in which a plurality of the Court upheld the Virginia Supreme Court's reversal of certain criminal convictions under Virginia's cross-burning statute on First Amendment grounds. The Court clarified its previous rulings with respect to 18 U.S.C. § 871, and for the first time announced the standard for determining what is a "true threat" under Watts, and clarifying that it requires proof of a defendant's state of mind. The Court, in reviewing the types of statutes that are constitutional under the First Amendment despite being directed at speech, stated that "the First Amendment . . . permits a State to ban a 'true

15

threat.'" *Id.* at 358-59 (citing *Watts*, 394 U.S. at 708; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)). The Court then went on to define a true threat:

> True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to particular individual or group of individuals. . . . The speaker need not actually intend to carry the threat out. Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . . Intimidation . . . . is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Id.* at 1548 (emphasis added, internal quotation marks omitted) (citing *Watts*, 394 U.S. at 708; *R.A.V.*, 505 U.S. at 388).

The majority's words in this passage, carefully chosen so as to clearly parse the significance of its First Amendment precedent, demonstrates that there is indeed a subjective element to the "true threat" element of a threat prosecution. Specifically, the defendant must have intended to communicate a "threat," meaning a serious expression of intention on their part to do harm. The defendant must have intended to place those hearing the words in fear that violence would be done by them to those threatened.

The requirement that a defendant intend to communicate a serious expression of intention to do harm (in other words that the defendant intended to communicate a "threat"), is necessary given that § 875(c) is a criminal offense punishing speech. If there were no state of mind requirement, the statute would be punishing mere negligent speech, in other words speech that a "reasonable" person would expect to be interpreted in a given way. *See, e.g., Elonis v. United States*, supra (striking down as unconstitutional any use of

16

the reasonable person standard in this regard); *Freedom of Speech*, 25 Harv. J.L. & Pub. Pol'y at 314-19 (explaining reasons under criminal and First Amendment law for inadequacy of objective standard for measuring true threat).

The clear direction of the Supreme Court's jurisprudence in this area is to err on the side of First Amendment protections, and to reserve application of a threat statute to those situations in which, a defendant unambiguously and intentionally communicates an intention to kill a person under circumstances in which a reasonable person would understand that the words constituted a threat.

Under the foregoing criteria, the communications alleged to be threats in the indictment herein cannot, therefore, be prosecuted by the government against this Defendant, because they do not come within the narrow "true threats" exception to the First Amendment right of free speech.

Moreover, Ms. Yassin' posted statements cannot be punished as "fighting words" or "obscenity." None of the persons who could have viewed the alleged communication could have been provoked, or were likely to be provoked, into a violent reaction by such incomplete statements.

**B. The indictment fails to state on offense because it does not allege that Ms. Yassin subjectively intended to convey a present or future "true threat" to injure the person of another.**

Even assuming arguendo, the statements were the Defendant's original statements,[6] the alleged statements have a lack of any specificity as to dates, times or places, it is clear

---

[6] It has already been disclosed by the government and admitted in court hearings that any

17

that the postings do not amount to serious threats. The evidence is, therefore, insufficient to establish the "true threats" element.

Following the Supreme Court decision in *Watts*, the Third Circuit has articulated the following three-part test for "true threats." First, the statements must be "viewed 'in context'" to determine whether they were truly threatening, or merely hyperbolic or crude statements, such as offensively worded political rhetoric. *United States v. Kosma*, 951 F.2d 949 at 553 (quoting *Watts*, 394 U.S. at 708). Second, the court should consider whether the posted statements were "conditional" or whether they "specified the precise date, time and place" for carrying out the supposed threat. *Id.* at 554. Third, the court should consider "the reaction of the listeners" and whether they were laughing or took the threats seriously. *Id.* The court should also consider who the "listeners" were, and whether the statements were directed [to the subject of the alleged threat]. *Id.* Application of this test here makes clear that Ms. Yassin's re-tweets do not constitute "true threats."

Regarding the first factor, the re-tweets alleged could be considered within the context of a political debate. However, if the Court even chose not to view such in that manner, such should not end the analysis. Political rhetoric during a debate or rally, in person or online, is just *one* example of a context in which a statement would not constitute a "true threat." Stand-up comedy and jokes would certainly be another, *United States v. Fuller*, 387 F.3d 643, 647 (7th Cir. 2004), as would "a merely crude or careless expression

_____

such alleged statements were merely re-tweets and not the original thoughts or postings of this Defendant, Ms. Yassin.

18

of political enmity," *Rogers v. United States*, 422 U.S. 35, 44 (1975) (Justice Marshall concurring), or "innocuous talk," *United States v. Miller*, 115 F.3d 361, 363 (6th Cir.), cert. denied, 522 U.S. 883 (1997).

The government's allegations as to Ms. Yassin's re-tweets may at most be characterized as obtuse "rhetoric," but cannot be seen as "true threats." Indeed, one of the most significant aspects of this context is the fact that Ms. Yassin plainly was not trying to communicate the alleged statements as her own, merely retweets, and as retweets communicate the statements/posts of others. As the Court stated in *Kosma*: "A communication is a threat when in its context [it] would have a reasonable tendency to create apprehension that its ***originator*** will act according to its tenor." *See Kosma*, 951 F.2d 549. Ms. Yassin is not the originator – it is a re-tweet. Anyone viewing the alleged posting can clearly see that someone else is the originator.

Indeed, this case cannot be divorced from its facts, and that is the simple understanding that millions of re-tweets and re-posts occur on the Internet every day for various purposes; to give information to friends, to alert the public of events, to call the others attention to the statements or actions of others, etc.

Regarding the second factor, although Ms. Yassin's statements were not "conditional," they also were not definite in that, unlike the defendant in *Kosma*, her alleged statements did not specify a "date, time and place." 951 F.2d at 554. This second factor thus does not weigh strongly in favor of viewing the Twitter re-tweets as "true threats."

Regarding the third factor, "the reaction of the listeners" there is no allegation by the government that anyone had any serious reaction or took any action as a result of Ms. Yassin's re-tweeting of these statements. This factor thus weighs very strongly against viewing the postings as a "true threat." It is certainly significant that no one from the public contacted government authorities at any level based on being disturbed or fearful after viewing the retweets of Ms. Yassin.

The alleged statements in the case at bar are not even close to those alleged in another § 875(c) case in which a "true threats" conviction was not sustained. In *United States v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997), the basis for the indictments against the defendant (known as Baker) was a series of email messages he exchanged with another individual (known as Gonda) who shared with him an interest in violence against women.[7] As one message stated: "I highly agree with the type of woman you like to hurt. You seem to have the same taste I have. When you come down, this'll be fun!" *Id.* at 14-22 (Krupansky, J., dissenting). They had numerous discussions of their mutual fantasies, and discussion of the logistics of abducting and injuring women. One message stated: "As I said before, my room is right across from the girl's bathroom. Wait until late at night. grab

---

[7] Although the indictments were focused on the defendant's email messages, there was also evidence in the record (which formed the basis for an earlier complaint) that Baker had penned a number of "sadistic fictional 'short stories'" which he distributed on an electronic bulletin board. These articles "evince[d] an extreme and morbid fascination with the concept of the physical and psychological abuse and torment of women and young girls, described in lurid detail, and often culminating in murder." *Id.* at 10 Krupansky, J., dissenting). One story was even named after an actual specific female classmate of Baker's. *Id.*

20

her when she goes to unlock the door. Knock her unconscious. and put her into one of those portable lockers (forget the word for it). or even a duffle bag. Then hurry her out to the car and take her away...What do you think?" *Id.* Another stated: "I had a great orgasm today thinking of how you and I would torture this very petite and cute, south american girl in one my classes." The other responded: "Just thinking about it anymore doesn't do the trick .. I need TO DO IT." *Id.*

Prior to trial, the defendant moved to quash the superseding indictment. The district court dismissed the superseding indictment, reasoning that the email messages sent back and forth "did not constitute 'true threats' under the First Amendment and, as such, were protected speech." *Id.* at 1493. On appeal, the Sixth Circuit did not directly address the First Amendment issue, instead limiting its opinion to the question of whether the messages "initially satisfy the requirements of § 875(c)." *Id.* The Court ultimately concluded that the email messages did not meet the requirements of the statute, and thus affirmed the decision of the district court. *Id.* at 1496.

Extracting from *United States v. DeAndino*, 958 F.2d 146 (6th Cir. 1992), the Sixth Circuit went on, however, to "consider the type of offense that Congress intended to prohibit when it enacted § 875(c)." It wrote:

> To determine what type of action Congress intended to prohibit, it is necessary to consider the nature of a threat. At their core, threats are tools that are employed when one wishes to have some effect, or achieve some goals, through intimidation. This is true regardless of whether the goal is highly reprehensible or seemingly innocuous.

21

*Id.* at 1495. After discussing several reasons why a threat could be made, it reached the important conclusion that a true threat is defined in part by its apparent purpose: "Although it may offend our sensibilities, a communication objectively indicating a serious expression of an intention to inflict bodily harm cannot constitute a threat unless the communication also is conveyed for the purpose of furthering some goal through the use of intimidation."

*Id.* The Sixth Circuit then expressed this definition in terms of two requirements necessary for a prosecution under § 875(c). The Court wrote:

> Accordingly, to achieve the intent of Congress, we hold that, to constitute "a communication containing a threat" under Section 875(c), a communication much be such that a reasonable person (1) would take the statement as a serious expression of an intention to inflict bodily harm (the mens rea), and (2) *would perceive such expression as being communicated to effect some change or achieve some goal through intimidation* (the actus reus).

*Id.* (emphasis added).

Applying this standard, the Sixth Circuit found that the emails between the defendant and his correspondent were not true threats, as they were not offered for the purpose of intimidating anyone or forcing someone to do something. It wrote:

> Even if a reasonable person would take the communications between Baker and Gonda as serious expressions of an intention to inflict bodily harm, no reasonable person would perceive such communications as being conveyed to effect some change or achieve some goal through intimidation. Quite the opposite, Baker and Gonda apparently sent e-mail messages to each other in an attempt to foster a friendship based on shared sexual fantasies.

*Id.* at 1496.

It should also be noted that in this case there is no additional or circumstantial evidence of a threat, as is often present in these cases. For example, there is no evidence of

22

any attempt by Ms. Yassin to contact or gain access to any of the parties identified in the indictment, no weapons, and no discussion of a plan, let alone any actual plan. Therefore, there is no evidence, beyond the re-tweet statements posted on Ms. Yassin's Twitter account, of any threat. Accordingly, in a review of the allegations (1) the context in which Ms. Yassin was merely reporting someone else's statements (2) the lack of specificity regarding time, date and place, and (3) that such statements are not even in the first person whereby she would be the one given "credit" for such thoughts, there is not substantial evidence to establish that Ms. Yassin's Twitter re-tweets constitute "true threats."

As the Supreme Court found in *Elonis*, such lack of allegations [and thus, evidence] on the government's part is not enough:

> Section 875(c), as noted, requires proof that a communication was transmitted and that it contained a threat. The "presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct." X-Citement Video, 513 U. S., at 72 (emphasis added). The parties agree that a defendant under Section 875(c) must know that he is transmitting a communication. But communicating something is not what makes the conduct "wrongful." Here "the crucial element separating legal innocence from wrongful conduct" is the threatening nature of the communication. *Id.*, at 73. The mental state requirement must therefore apply to the fact that the communication contains a threat. Elonis's conviction, however, was premised solely on how his posts would be understood by a reasonable person. Such a "reasonable person" standard is a familiar feature of civil liability in tort law, but is inconsistent with "the conventional requirement for criminal conduct— awareness of some wrongdoing." Staples, 511 U. S., at 606–607 (quoting United States v. Dotterweich, 320 U. S. 277, 281 (1943); emphasis added). Having liability turn on whether a "reasonable person" regards the communication as a threat—regardless of what the defendant thinks— "reduces culpability on the all-important element of the crime to negligence," Jeffries, 692 F. 3d, at 484 (Sutton, J., dubitante), and we "have long been reluctant to infer that a negligence standard was intended in criminal statutes," Rogers v. United States, 422 U. S. 35, 47 (1975) (Marshall, J., concurring) (citing Morissette,

23

342 U. S. 246). *See* 1 C. Torcia, Wharton's Criminal Law §27, pp. 171–172 (15th ed. 1993); Cochran v. United States, 157 U. S. 286, 294 (1895) (defendant could face "liability in a civil action for negligence, but he could only be held criminally for an evil intent actually existing in his mind"). Under these principles, "**what [Elonis] thinks**" does matter. App. 286. (emphasis added).

135 S.Ct. 2001 at 2014. Thus, dismissal of the indictment herein is required.

### C. 18 U.S.C. § 875(c) Is Unconstitutionally Overbroad On Its Face.

"In the first Amendment context . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 130 S.Ct. 1577, 1587 (2010). Thus, Ms. Yassin need not show that § 875(c) is unconstitutional as applied to her Twitter account and postings; instead, she must show that the statute implicates a substantial amount of protected expression. *See United States v. Marcavage*, 609 F.3d 264 (3d Cir. 2010) (on a facial challenge in the First Amendment free speech context, a plaintiff may demonstrate either that no set of circumstances exists under which the law would be valid, i.e., that the law is unconstitutional in all of its applications, or that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the law's plainly legitimate sweep); *see also*, *United States v. DiPietro*, 615 F.3d 1369, 1372-73 (11th Cir. 2010).

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). As § 875(c) is written, the gravamen of the offense is the transmission of the communication containing the threat

24

to injure.  In some contexts, there is no requirement that the government prove authorship of the threatening communication.  *See United States v. Bloom*, 834 F.2d 16, 18-19 (1st Cir. 1987) (interpreting 18 U.S.C. § 876, which proscribes the mailing of any threatening communication).  The only limitation to § 875(c)'s reach comes from *Watts*, which requires that the threat be a "true threat."  *See Watts*, 394 U.S. at 708.

After construing the statute, the court must then determine whether the law as construed "criminalizes a substantial amount of protected expressive activity."  *Williams*, 553 U.S. at 297.  This example in the case at bar makes that point absolutely clear.  As stated and described herein above, the Internet is host to millions of posts each day, in a variety of platforms, with posts done in a variety of ways; i.e. transmitted privately or directly to someone such as a personal email, transmitted as a public post of one's own thoughts such as a "blog" and the plagiarized and unoriginal category known as re-posts such as a re-tweet, which serves as the basis for the alleged statements in the indictment herein.  Are each of these subject to prosecution under this statute without regard to intent of the speaker, the definiteness of the statement, a lack within the communication of any intent on the part of the transmitter of the statement or re-statement to threaten injury by them now or at a later time?  Such cannot be within constitutional boundaries.

The Court in *Stevens* struck down as overbroad a federal statute banning any visual or auditory depiction "'in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed,' if that conduct violates federal or state law where 'the creation, sale, or possession takes place.'" 130 S.Ct. at 1582 (quoting 18 U.S.C. § 48(c)(1)).

25

Although the statute expressly exempted "any depiction 'that has serious religious, political, scientific, educational, journalistic, historical, or artistic value,'" the Court determined that the law implicated more constitutionally protected conduct than it did speech unprotected by the First Amendment. *See id.* at 1592.

Like the provisions struck down in *Stevens*, 18 U.S.C. § 875 (c) covers a substantial amount of protected speech in addition to its prohibitions on threatening communications. And, unlike the statute in Stevens, there is no exceptions clause exempting speech that has serious artistic or literary value. The law could be applied to the transmission of virtually any action movie, and renders criminal the trash-talk that occurs before most boxing matches and football games. In addition, the plain text of the statute could be used to prosecute any member of the news media who covers or disseminates threatening communication made by others.

Finally, to the extent that § 875(c) can be used to prosecute someone who, without intending to threaten, nonetheless transmits a statement that a reasonable person finds intimidating, precedent that is binding on this Court at this juncture would support his or her conviction. For all these reasons, § 875(c) is substantially overbroad.

### D. 18 U.S.C. § 875(c) Is Unconstitutionally Vague.

Statutes, such as 18 U.S.C. § 875(c), that are insufficiently clear are vague (1) to avoid punishing people for behavior that they could not have known was illegal, (2) to avoid subjective enforcement of the laws based on arbitrary or discriminatory interpretations by government officers, and (3) to avoid any chilling effect on the exercise

of sensitive First Amendment freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). Vagueness concerns are more acute when a law implicates First Amendment rights and a heightened level of clarity and precision is demanded of criminal statutes because their consequences are more severe. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). To pass a constitutional challenge, statutes challenged as vague must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply it to avoid arbitrary and discriminatory enforcement. *See generally Saxe v. State College Area School Dist.*, 240 F.3d 200 (3d Cir. 2001).

There can be no legitimate argument made that 18 U.S.C. § 875(c) provides explicit standards for those who apply it. The statute does not define what constitutes a threat–the only guidance on this issue has come from the courts. Moreover, under the government's view any speaker can violate § 875(c) by communicating a statement intended to be informative or even in jest that negligently communicates a true threat. The law in this vein provides too wide of a net and is thus, overbroad. This clearly fails to provide a person with a reasonable opportunity to know what speech is disallowed and what is not.

The Supreme Court has already acknowledged in *Elonis* that vagueness within the wording of 18 U.S.C. § 875(c) exists:

> An individual who "transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another" is guilty of a felony and faces up to five years' imprisonment. 18 U. S. C. § 875(c). This statute requires that a communication be transmitted and that the communication contain a threat. ***It does not specify*** that the defendant must have any mental state with respect

27

to these elements. In particular, it does not indicate whether the defendant must intend that his communication contain a threat.

*Id.* 575 U.S. at 10 (2015).

However, as Justice Alito strongly points out in his concurring opinion the entirety of the vagueness within 18 U.S.C. § 875(c) was not cured with the Court's majority opinion in *Elonis*:

> In Marbury v. Madison, 1 Cranch 137, 177 (1803), the Court famously proclaimed: "It is emphatically the province and duty of the judicial department to say what the law is." Today, the Court announces: It is emphatically the prerogative of this Court to say only what the law is not. The Court's disposition of this case is certain to cause confusion and serious problems. Attorneys and judges need to know which mental state is required for conviction under 18 U. S. C. § 875(c), an important criminal statute. This case squarely presents that issue, but the Court provides only a partial answer. The Court holds that the jury instructions in this case were defective because they required only negligence in conveying a threat. But the Court refuses to explain what type of intent was necessary. Did the jury need to find that Elonis had the purpose of conveying a true threat? Was it enough if he knew that his words conveyed such a threat? Would recklessness suffice? The Court declines to say. Attorneys and judges are left to guess. This will have regrettable consequences. While this Court has the luxury of choosing its docket, lower courts and juries are not so fortunate. They must actually decide cases, and this means applying a standard. If purpose or knowledge is needed and a district court instructs the jury that recklessness suffices, a defendant may be wrongly convicted. On the other hand, if recklessness is enough, and the jury is told that conviction requires proof of more, a guilty defendant may go free. We granted review in this case to resolve a disagreement among the Circuits. But the Court has compounded—not clarified—the confusion.

*Elonis*, 575 U.S. at page 21, (Alito, J., concurring); *see also First Amendment: Speech, Elonis v. United States*, Harv. L. Rev. 331 (Nov. 10, 2015).[8]  Thus, because the majority

---

[8] Because *Elonis* was decided on statutory grounds, "true threats" remain a doctrinal puzzle for lower courts.

opinion omitted in their ruling any clarification in this regard, the statute remains unconstitutionally vague.

To pass constitutional muster, statutes challenged as vague must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply it to avoid arbitrary and discriminatory enforcement. *Bama Tomato Co. v. U.S. Dep't of Agriculture*, 112 F.3d 1542 (11th Cir. 1997). There can be no real argument made that § 875(c) provides explanatory standards for those who apply it and for the public who is entitled to notice of what the law is. The statute does not define what constitutes a threat—the only guidance on this issue has come from the courts on a case-by-case basis and that only occurs after the action has occurred. That is constitutionally insufficient.

Wherefore, for the reasons states above, Ms. Yassin moves this Court to grant her motion and dismiss the indictment in the above referenced case.

Respectfully submitted,

/s/ Ian A. Lewis
**IAN A. LEWIS, #52819**
Assistant Federal Public Defender
901 St. Louis Street, Suite 801
Springfield, Missouri 65806
(417) 873-9022
Attorney for Defendant

July 11, 2016

29

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants in this case and a copy was mailed, via the United States Postal Service, to all non-CM/ECF participants.

*/s/ Ian A. Lewis*
**IAN A. LEWIS**