IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

UNITED STATES OF AMERICA,  )
                           )
            Plaintiff,     )
vs.                        )        No. 16-3024-01-CR-S-MDH
                           )
SAFYA ROE YASSIN,          )
                           )
            Defendant.     )

## OBJECTIONS TO THE REPORT & RECOMMENDATION OF

## THE UNITED STATES MAGISTRATE JUDGE

COMES NOW Defendant, Safya Roe Yassin ("Defendant"), and files these objections to the Magistrate's Report & Recommendation (herein "Report"), and requests that the Court grant her motion to dismiss the indictment.[1]

**I.    *Motion to Dismiss the Superseding Indictment.***

**A.    *The alleged "threats" do not as a matter of law constitute "true threats."***

The Report's findings do not take into account the factors for determining that the alleged act(s) is a true threat.  In *Doe v. Pulaski County Special School District,* 306 F.3d 616, 622-623 (8th Cir. 2002), the Court outlined the analytical process as follows:

> In *United States v. Dinwiddie,* we emphasized the fact intensive nature of the true threat inquiry and held that a court must view the relevant facts to determine "whether the recipient of the alleged threat could reasonably conclude that it expresses 'a determination or intent to injure presently or in the future.' " 76 F.3d 913, 925 (8th Cir.) (quoting *Martin v. United States,* 691 F.2d 1235, 1240 (8th Cir.1982)), *cert. denied,* 519 U.S. 1043, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996); *see also United States v. Hart,* 212 F.3d 1067, 1071 (8th

---

[1] Although Ms. Yassin objects to the report in its entirety, at this juncture, she will focus these Exceptions on a limited number of specific points.  Ms. Yassin incorporates by reference her prior pleadings and motions filed herein as to her Motions to Dismiss in this matter.

1

Cir.2000) (quoting *Dinwiddie* 's statement of what amounts to a true threat), *cert. denied,* 531 U.S. 1114, 121 S.Ct. 860, 148 L.Ed.2d 774 (2001). We also set forth in *Dinwiddie* a nonexhaustive list of factors relevant to how a reasonable recipient would view the purported threat. Those factors include: 1) the reaction of those who heard the alleged threat; 2) whether the threat was conditional; 3) whether the person who made the alleged threat communicated it directly to the object of the threat; 4) whether the speaker had a history of making threats against the person purportedly threatened; and 5) whether the recipient had a reason to believe that the speaker had a propensity to engage in violence.

*Dinwiddie,* 76 F.3d at 925.

The Report misinterprets the meaning of a reposting on Twitter, or as it is commonly known as a "Retweet." All of the alleged threats in the Superseding Indictment allegedly were re-posts by the Defendant of another person or entity's original tweet.[2] Re-posts of tweets are common in the world of Twitter and are done by media organizations quite frequently in order to provide information and for other reasons.

Twitter's own definition of a Retweet conclusively establishes that a Retweet (or reposting) does not contain a statement by the person posting the Retweet:

> **FAQs about Retweets**
> What is a Retweet?
>
> - A Retweet is a re-posting of a Tweet. Twitter's Retweet feature helps you and others quickly share that Tweet with all of your followers. You can Retweet your own Tweets or Tweets from someone else.
> - Sometimes people type RT at the beginning of a Tweet to indicate that they are re-posting someone else's content. This isn't an official Twitter command or feature, but signifies that they are quoting another user's Tweet.[3]
>
> What is a Retweet?
> A Tweet that you share publicly with your followers is known as a Retweet. This is a great way to pass along news and interesting discoveries on Twitter. You have

---

[2] *See,* Superseding Indictment (Doc. # 73) herein, specifically paragraphs 6 and 7, which identify the alleged mechanism for being involved in the alleged threats as she "posted on Twitter a message previously posted by another user…." This type of alleged action is commonly known on the Internet as a "Retweet." See, *infra.*

[3] https://support.twitter.com/articles/77606

the option to add your own comments before Retweeting—making it a Quote Tweet. When using Twitter's Retweet icon, your Retweet or Quote Tweet will reference the Tweet you are sharing.[4]

The actions alleged in the Superseding Indictment distinguish Retweets and Quote Tweets, which the Report does not do. Contrary to what the Report relies upon, that Ms. Yassin "made statements" of her own, there is nothing in the alleged postings that are alleged to be Ms. Yassin's "own comments." (Report at p. 4).

The Report on page 8 makes the incorrect finding that it can only be concluded outside the "four corners" of the Superseding Indictment that the alleged communications are "Retweets" and what that means is incorrect. The Government declares in the Superseding Indictment that the alleged communications are a "message previously posted by another user." See, fn. 2, supra. Moreover, the assumption in the Report as to what is a Retweet is also incorrect:

> Second, even assuming this was a retweet (as asserted by Defendant), there is a general understanding that "[b]y clicking 'retweet,' the user intends to convey the message that she agrees with the 'tweet,' and viewers will understand it that way." Bethany C. Stein, *A Bland Interpretation: Why a Facebook "Like" Should Be Protected First Amendment Speech*, 44 Seton Hall L. Rev. 1255, 1277 (2014) (discussing the difference between a Facebook "like" and a "retweet" on Twitter).[5]

---

[4] https://support.twitter.com/articles/20169873

[5] Report at pages 8-9. Such article by law student Stein actually does not cite to any authority that a Facebook "like" equates to a Twitter "retweet" as the Report represents. The only reference in the article is footnote 189: "See discussion of expressive conduct, supra Part IV.A." However, Part IV.A. does not discuss Retweets at all; it only analyzes a court's interpretation of interaction of the First Amendment and Facebook "likes." Defendant respectfully asserts that the definition relied upon of what the trademarked word Retweet is should be by the Twitter company itself and can be what is authoritatively accepted by this Court pursuant to Federal Rules of Evidence 901(4) and 902(7).

3

Thus, the Report's statement and assumption on page 9 that "Given this information, the Court would conclude that the statements should be analyzed as if they were Defendant's own words for the purposes of the Motion to Dismiss" is both factually and legally incorrect as a matter of law.

> **B.** **There is nothing in the Superseding Indictment that establishes subjective intent on the part of the Defendant as required by the Elonis standard.**

> **1.** **Use of the Elonis standard is not premature as a standard for the motion to dismiss for failure to state an offense, and cannot be met by the allegations in the Superseding Indictment as a matter of law.**

The Report on pages 7, 9 and 10, respectively, makes the following incorrect legal assumptions:

> The Court first notes that the question of whether the allegations alleged constitute a true threat is a question reserved for the jury and thus would seem premature at this stage in the litigation. *See, e.g.,* *United States v. Abdulkadir*, 2016 WL 659711 at *3 (D. Minn. Feb. 18, 2016).

> With regards to Defendant's second argument, she asserts that the Indictment must be dismissed because it does not allege that Defendant subjectively intended to convey a present or future threat to injure another person, as required by *Elonis v. United States*, 135 S. Ct. 2001 (2015). This argument, however, is premature. In *Elonis*, the jury instructions, not the charge in the indictment, were at issue. *Id.* at 2007.

> Whether Defendant actually made the statements with the intention or knowledge alleged in the Indictment is a question that a jury should decide, not this Court at this stage in the litigation.[6]

First, the Court in *Abdulkadir*, 2016 WL 659711 at *3, does not state that such issue is "reserved" for the jury alone. The opinion states, "While acknowledging that the question of whether speech constitutes a true threat is **typically posed** to the jury, Abdulkadir argues that the

---

[6] See Part II.B.2. *infra* for discussion of the Court's incorrect assumption/finding that the Defendant "made" statements.

Case 6:16-cr-03024-MDH   Document 104   Filed 03/22/17   Page 4 of 25

court can dismiss an indictment if no reasonable jury could find that the communication constitutes a true threat." The Court in *Abdulkadir* did not adhere to a standard that the issue is one for juries alone. *Id*. Second, the Court in *Abdulkadir* was addressing the defendant's assertion that the allegations of a threat being made were vague, not that there was a lack of subjective intent because the allegations were "message[s] previously posted by another user." 2016 WL 659711 at *3.

The Report at page 11 agrees "The *Elonis* decision later stated that specific intent is required to show a violation of § 875(c). *Elonis*, 135 S. Ct. 2001." Thus, allegations within the Superseding Indictment herein must include the *Eloni*s intent element and standard, or it is constitutionally defective. The Government cannot not dispute this as an applicable legal principle. As stated in the Department of Justice Manual, Vol. 5, Title 9 Number 225, *Charging in the Language Statute*, (2017-2 Supplement):

> However, reliance on the language of the statute was fatal to an indictment in a case in which the defendant was charged with involuntary manslaughter under 18 U.S.C. § 1112. Relevant case law had held that gross negligence and actual knowledge of potential harm were additional elements of the offense. The absence of such allegations in the indictment was not cured by the government's proof at trial of these elements or their inclusion in the court's instructions to the jury. *See United States v. Opsta*, 659 F. 2d 848 (8th Cir. 1981). *Cf., United States v. Daniels*, 973 F. 2d 272, 274-75 (4th Cir. 1992), *cert. denied*, 506 S. Ct. 1086 (1993) (citation to statute insufficient to cure failure of indictment to allege each element of crime when indictment neither tracked statutory language nor cited actual sections violated, because omission opens risk of grand jury failure to consider and find all elements of crime). *United States v. Rojo*, 727 F.2d 1415, 1416, 1418-19 (9th Cir. 1983) (indictment for theft of public property insufficient when it contained only general citation to statute without any reference to act allegedly committed or to specific provisions of statute).

5

If one of the elements relates to the *mens rea* required for the offense, but such is not included within the statute itself, the Eighth Circuit has instructed that the case law proscribing such element be adhered to in the Indictment's pleading:

> To be sufficient an indictment must set forth the essential elements of the offense. *United States v. Vesaas*, 586 F.2d 101, 103 n.4 (8th Cir. 1978); *United States v. Camp*, 541 F.2d 737, 739 (8th Cir. 1976). The Supreme Court has stated that (i)t is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." (Citation omitted). *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 129, rehearing denied, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974); *United States v. Camp*, supra, 541 F.2d at 739.
>
> The government argues that although the indictment did not allege gross negligence and actual knowledge, the government proved those elements beyond a reasonable doubt at trial and the trial jury was properly instructed on all the essential elements of the crime. Thus, the defendant was convicted after consideration by the jury of all the essential elements and her conviction should stand even though it was based on an invalid indictment. We disagree.
>
> The Supreme Court has held that the purpose of the fifth amendment "requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Russell v. United States*, 369 U.S. 749, 771, 82 S.Ct. 1038, 1051, 8 L.Ed.2d 240 (1962); *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). In order to guarantee that a defendant will not be brought to trial except for charges found by a grand jury the rule has been established that an invalid indictment cannot be cured by amendments or additions "except by resubmission to the grand jury." *Russell v. United States*, supra, 369 U.S. at 770, 82 S.Ct. at 1050.
>
> In holding that a defective indictment cannot be cured by a bill of particulars or by proper jury instructions at trial this court in *United States v. Camp*, supra, 541 F.2d at 740, said "(o)nly the words of the indictment give evidence of whether the grand jury

6

considered and included within the offense charged the
essential element(s) * * *." In the present case gross negligence
and actual knowledge are essential elements of involuntary
manslaughter, and we "cannot say that the grand jury would have
returned a true bill against the defendant if the essential element of
a criminal intent would have been included in the indictment."
*United States v. Denmon*, supra, 483 F.2d at 1097. In fact, it is
possible that defendant was indicted without any finding of
negligence by the grand jury. We therefore hold that the
defective indictment was not cured at trial and
the indictment must be dismissed.[4]

Judgment reversed and case remanded to the district court to set
aside the judgment, vacate the sentence and grant the original
motion to dismiss the indictment.

*United States v. Opsta*, 659 F.2d 848, 850 (8th Cir. 1981).

Opsta was convicted of involuntary manslaughter under a statute, which defined the

crime as simply "the unlawful killing of a human being without malice ... [i]n the commission of

an unlawful act not amounting to a felony...." Id., at 848 (quoting 18 U.S.C. § 1112). Circuit case

law, however, had "added the elements of gross negligence and actual knowledge of potential

harm to others to §1112 involuntary manslaughter." *Id*., at 849. Agreeing that actual knowledge

and gross negligence were indeed non-statutory elements, the Government "argued that those

elements were only required for conviction and were not required to be set out in the

indictment." Id., at 849, n. 2. Furthermore, the jury had been properly instructed regarding those

two elements. *Id*., at 849.

The Eighth Circuit recognized that the failure to allege all essential elements in the

indictment violates the purpose of the Fifth Amendment grand jury clause. *Id*., at 850. A

deficient indictment is not cured by proper jury instructions because "(o)nly the words of the

indictment give evidence of whether the grand jury considered and included within the offense

charged the essential element(s)," and the absence of the two non-statutory but nonetheless

7

essential elements prevented the court from being able to "say that the grand jury would have returned a true bill against the defendant if the essential element[s] ... would have been included in the indictment." Id. (internal quotations and citations omitted). Thus, the failure to allege these two essential elements rendered "the indictment fatally defective and require[d] dismissal of the indictment." *Id. See also United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996). ("When, however, one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense.") (overruled on other grounds, *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469 (1997)).

Thus, this legal principle involves not only what is a matter of what are the proper jury instructions for an offense, but are also required to be pled in order to give the Defendant proper Sixth Amendment notice of the charges against them and what the allegations supporting those charges are. *United States v. Murphy*, 762 F.2d 1151 (1st Cir. 1985).

The grand jury should have been required to determine whether Ms. Yassin's "mental state requirement in § 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." See *Elonis*, supra, 135 S.Ct. at 2012. There is good reason to believe that it would have found this element absent, given all that the only alleged overt acts in the Superseding Indictment are that she:

> "…would promote the newly created Twitter accounts of other co-conspirators to maintain a constant presence of Twitter accounts providing information that they believed to be from ISIL, including threats and solicitations of violence against current and former officers and employees of the United States. . .
>
> posted on Twitter a message previously posted by another user with the explicit phrase "Wanted to kill" followed by the first and last name, status as an employee of the Federal Bureau of Investigation, city of residence, zip code, and phone

number of Victim 1, and then, in the same communication, repeated the same
explicit "Wanted to kill" phrase followed by the first and last name, status as an
employee of the Federal Bureau of Investigation, city of residence, zip code, and
phone number of Victim 2.

Moreover, it is admitted by omission within the four corners of the Superseding Indictment that

Ms. Yassin did not "issue" her own threat as required by *Elonis*, but only that she allegedly

"…posted on Twitter a message previously posted by another user… ."[7]

Furthermore, Ms. Yassin's liability under an aiding and abetting and conspiracy theories,

18 U.S.C. § 2(a) and § 371, both require allegations and findings of intent and *mens rea*.[8]

---

[7] District Court Case No. 16-cr-03024-MDH, Doc. # 73.

[8] Eighth Circuit Pattern Criminal Jury Instruction 5.01 AIDING AND ABETTING (18 U.S.C. §
2(a)): A person may [also] be found guilty of (insert principal offense) even if [he] [she]
personally did not do every act constituting the offense charged, if [he] [she] aided and abetted
the commission of (describe principal offense). In order to have aided and abetted the
commission of a crime a person must [before or at the time the crime was committed,]: (1) have
known (describe principal offense) was being committed or going to be committed; (2) have had
enough advance knowledge of the extent and character of [specify the crime] that [he][she] was
able to make the relevant choice to walk away from [specify the crime] before all elements of
(insert principal offense) were complete; [and] (3) have knowingly acted in some way for the
purpose of [causing] [encouraging] [aiding] the commission of (describe principal offense)[.] [;
and] [(4) have [intended] [known] (insert mental state required by principal offense).] For you to
find the defendant guilty of (insert principal offense) by reason of aiding and abetting, the
[government] [prosecution] must prove beyond a reasonable doubt that all of the elements of
(describe principal offense) were committed by some person or persons and that the defendant
aided and abetted the commission of that crime.

Eighth Circuit Pattern Criminal Jury Instruction 5.06A-I  Conspiracy: Elements (18 U.S.C.
§371): It is a crime for two or more people to agree to commit a crime. The crime of
conspiracy,1 as charged in Count — of the indictment, has four elements, which are: One, on or
before (insert date), two [or more] people reached an agreement to commit the crime[s] of
[(insert name of offense(s) alleged in the indictment being submitted to the jury, e.g., mail fraud
and money laundering)];3 Two, the defendant voluntarily and intentionally joined in the
agreement, either at the time it was first reached or at some later time while it was still in effect;
Three, at the time the defendant joined in the agreement, the defendant knew the purpose of the
agreement; and Four, while the agreement was in effect, a person or persons who had joined in
the agreement knowingly did one or more acts for the purpose of carrying out or carrying
forward the agreement.

9

The tenuous nature of the Government's claims of conspiracy and aiding and abetting only magnifies the harm to Ms. Yassin from the Superseding Indictment's failure to allege actual intent on her part to make (not republish) a threat.

### 2. The absence of these elements violates both Ms. Yassin's Fifth and Sixth Amendment rights.

The Superseding Indictment's failure to allege either reasonable specificity or actual knowledge violates Ms. Yassin's Sixth Amendment right to fair notice of the nature of the charge against her. *See United States v. Hathaway*, 318 F.3d 1001, 1010 (10th Cir. 2003) ("this indictment did not set forth all the elements of the offense of conviction, and did not put Mr. Hathaway on fair notice ....").

In addition to failing to provide notice, the Superseding Indictment here failed to require the grand jury to "find all essential elements of the offense and recite these elements in the indictment." *United States v. Mobile Materials*, Inc., 871 F.2d 902 (10 Cir. 1989) (abrogated on other grounds by *Bloate v. United States*, 130 S.Ct. 1345, 1356 (2010)). This "Fifth Amendment challenge based on [Ms. Yassin's] right to be tried for a felony only upon a finding of probable cause by the grand jury," is distinct from the Sixth Amendment notice challenge also asserted here. *United States v. Gama-Bastidas*, 222 F.3d 779, 786 (10th Cir. 2000). The Supreme Court has described the harm resulting from an indictment's failure to include all essential elements:

> To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.

*Russell v. United States*, 369 U.S. 749, 770 (1962). ; *see also United States v. Pirro*, 212 F.3d 86, 92 (2 Cir. 2000) ("If the indictment does not state the essential elements of the crime, the

defendant cannot be assured that he is being tried on the evidence presented to the grand jury, ... or that the grand jury acted properly in indicting him.") (internal citations omitted).

### 3. The Superseding Indictment's failure to allege an essential element in Counts 2 and 3, renders Count 1 fatally defective.

The Superseding Indictment's failure to include factual allegations that Defendant subjectively intended to convey a present or future threat to injure another person as elements in Counts 2 and, as discussed supra, is fatal to Count 1 also. In *Nelson v. United States*, 406 F.2d 1136 (10 Cir. 1969) the Tenth Circuit addressed "whether a conspiracy indictment is rendered fatally defective as a result of the failure to allege an essential element of the substantive offense upon which the conspiracy charge is based."

In *Nelson*, the conspirators, who were charged under § 371, were accused of agreeing to violate 18 U.S.C. § 2314 by transporting altered securities in interstate commerce. Id. However, the indictment failed to "allege that the acts were accompanied 'with unlawful and fraudulent intent' as is required to sustain a substantive violation of 18 U.S.C. § 2314." *Id.*, at 1136-37. After considering both Tenth Circuit and Supreme Court precedent, the Tenth Circuit ruled that it would "require an averment of the essential elements upon which the underlying offense rests." *Id.*, at 1137. Because that averment was absent from the indictment, the conviction was reversed and the indictment dismissed. *Id.*, at 1138.

This case presents at least as defective an indictment as in *Nelson*, as here elements of "reasonable specificity" and "actual knowledge" are absent from both Count 1, which charges the Defendants with conspiracy under 18 U.S.C. § 371, and Count 2, the substantive criminal contempt charge. While both elements are essential and their absence from the Superseding Indictment fatal, the absence of the actual intent element is particularly noteworthy. Here, the alleged object of the conspiracy was the commission of making a threat pursuant to 18 U.S.C. §

11

875(c).  Conspiracy to violate a federal law requires "at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola*, 420 U.S. 671, 686, 95 S.Ct. 1255, 1265 (1975).

There are no allegations in the Superseding Indictment that Ms. Yassin participated in activities that can be as a matter of law construed to meet the *Elonis* standard of intent.  All that is alleged is that she had Twitter accounts and she reposted the postings of others.  If this were legally sufficient to violate 18 U.S.C. § 875(c) then practically every media outlet in the world could be prosecuted for this offense.  Moreover, there are no allegations pled in the Superseding Indictment that she made an express agreement with one or more persons to commit any illegal acts.  Thus, there are no allegations of a conspiracy to commit such offenses either.

> **4.    *The Report incorrectly states and relies on the premise that it is alleged in the Superseding Indictment that Ms. Yassin "made" statements.***

The Report on pages 7 and 10, respectively, makes the following incorrect factual and legal findings/assumptions as to the actions alleged in the Superseding Indictment to have been taken by Ms. Yassin:

> It provides specific details regarding the charges, including: statements allegedly made by Defendant with the phrases "wanted to kill" and "to eventually hunt him down & kill him" with the names, employee information, address, and phone number of certain individuals working at the FBI; and allegations that Defendant made these statements "with the intent to threaten, and with knowledge that the communication would be viewed as a threat." (*See* Doc. 73.)

> As noted, the Indictment clearly alleges that Defendant made these statements "with the intent to threaten, and with knowledge that the communication would be viewed as a threat."

(Doc. 73.)

The review of the Superseding Indictment establishes that the quoted portion of these passages are included by the Government in their pleading, but nowhere in this document is it alleged that Ms. Yassin "made" these statements to anyone. Doc. #73; See also discussion of Retweet mechanism Part II.A. *supra*.

This incorrect reliance within the Report, along with how the Report misconstrues the accepted meaning of a Retweet, prevents the acceptance of the Court's ultimate finding and recommendation that the Defendant's Motion to Dismiss (for failure to state a claim) should be denied because the allegations within the Superseding Indictment are sufficient as a matter of law.

5. ***The context of the alleged statements are insufficient as a matter of law because they do not, as alleged, communicate an intent to take any action whatsoever.***

In a very similar case, the Fourth Circuit Court of Appeals in *United States v. White*, 670 F.3d 498, 513-514 (4th Cir. 2012), found that there was insufficient intent as to the charges in Count 6 of that indictment:

> White's communications directly and indirectly to Richard Warman were part of a protracted campaign to oppose Warman's work in Canada, fighting neo-Nazi and white supremacy groups. Except for the two communications charged in Count 6, however, these communications were presented only as context, and as context, they were insufficient to elevate the communications in Count 6 to true threats.

The reasoning found by the Court in *White* as to the context is applicable here, but was not applied in the Report:

> The first of the two communications forming the basis for the conviction on Count 6 was a February 8 posting on a web-site that referenced the recent firebombing of a Canadian civil rights activist's house with the subscript, "Good. Now someone do it to Warman." The second, in March 2008, was again a posting on White's website indicating that Warman "should be drug [sic] out into the street and shot." It also asserted that "Richard Warman is an enemy, not just to the white race but of all humanity and he must be

13

killed." These communications clearly called for someone to kill Richard Warman. But neither communication actually provided a threat from White that expressed an intent to kill Warman. While a direct threat of that type would not always be necessary, for White to have called on others to kill Warman when the others were not even part of White's organization, amounted more to political hyperbole of the type addressed in *Watts* than to a true threat. Moreover, the two communications forming the basis for Count 6 were posted to neo-Nazi websites and not sent directly to Warman.

While a direction to others to kill Warman could have amounted to a threat if White had some control over those other persons or if White's violent commands in the past had predictably been carried out, none of that context exists in this case. In short, the communications that formed the basis of Count 6 were expressions not directed to Warman but to the public generally and did not communicate an intent to take any action whatsoever. In these circumstances, we agree with the district court that the communications fell short of being true threats.

The government argues that a communication does not have to be given or sent directly to the threatened individual to be a true threat, citing to *United States v. Lockhart,* 382 F.3d 447 (4th Cir.2004), where we upheld a conviction under a different threat statute after the defendant delivered a letter to a grocery store threatening to kill the President. *See also Floyd,* 458 F.3d at 849; *United States v. Dinwiddie,* 76 F.3d 913, 925–26 & n. 9 (8th Cir.1996). While the government is correct in noting that neither direct communication nor personal or group involvement in the threat is an essential component to finding a true threat, the lack of both, along with the fact that White's language was clearly directed to others in the form of advocacy, makes it impossible for us to conclude that a reasonable recipient would understand White's communications to be **\*514** *serious expressions of intent to commit harm.*

The government argues further that the context in which White's statements were made elevates the statements and makes up for the lack of a direct threat to commit harm. It points to White's earlier references to actual violence, such as firebombing of an activist's house, and the violent edge that accompanied all of White's statements. The government argues that these public statements were made relevant to Warman and were specifically designed to threaten Warman. But even taking into account the context created by these earlier communications, we cannot conclude that a reasonable recipient would believe that White's two communications advocating violence to Warman expressed an

Case 6:16-cr-03024-MDH   Document 104   Filed 03/22/17   Page 14 of 25

intent to harm Warman. The principal message expressed in White's communications was that *someone else* should kill Warman.

While the two communications for which White was indicted, along with the context surrounding them, may have undoubtedly frightened Warman, those communications at most conveyed a *serious desire* that Warman be harmed by others but did not convey a *serious expression of intent* to do harm from the perspective of a reasonable recipient. Accordingly, we affirm the district court's judgment of acquittal on Count 6.

*Id*. at 513-514.

Nowhere in the Superseding Indictment is it alleged that Ms. Yassin conveyed a *serious expression of intent* to do harm herself.

### C.    *Overbreadth and Vagueness Analysis*

The Report incorrectly counsels the denial of Ms. Yassin's motion to dismiss based primarily on a misapplication of the Supreme Court's opinion in *Virginia v. Black*, 538 U.S. 343, 359, 367 (2003) (holding that Virginia's cross-burning statute violated the First Amendment because the law did not require the state to prove that defendants intended to intimidate) and appellate decisions that are not construing 18 U.S.C. § 875(c) or are construing the statute pre-*Elonis*.

18 U.S.C. § 875(c) prohibits the knowing transmission of any communication containing any true threat. The Report on page 13 asserts that "Defendant's argument regarding the lack of a definition of "threats" is unpersuasive based primarily on three basis discussed on pages 11-13:

(1)    [T]he Eighth Circuit has ruled that a statute very similar to § 875(c) regarding communication of threats via mail, 18 U.S.C. § 876(c) was not overbroad when construing it as a general intent crime. *Mabie*, 663 F.3d at 332-33.[9] In that case, the court acknowledged the use of an objective test for determining whether a communication amounted to a true threat and thus did not require the government to show a specific intent to threaten in order to show a violation of § 876(c). *Id.* at 333. (internal footnote omitted).

---

[9] *United States v. Mabie*, 663 F.3d 322, 333 (8th Cir. 2011).

(2)        Additionally, other courts have concluded that § 875(c) is not impermissibly vague because "[a]n ordinary citizen can understand what is meant by the terms 'threat to kidnap' and 'threat to injure,' and we are persuaded that the statute provides sufficient standards to allow enforcement in a non-arbitrary manner." *United States v. Sutcliffe*, 505 F.3d 944, 953-54 (9th Cir. 2007); and

(3)        Defendant's argument regarding the lack of a definition of "threats" is also unpersuasive because the construction of "threats" in § 875(c) by courts as "true threats" makes the statute not vague. *See id*. at 953 ("the narrowing construction provided by the relevant cases actually alleviates possible void-for-vagueness concerns.").

As for the first premise, the Court's ruling in *Mabie* is not applicable. It is a decision construing a different statute, 18 U.S.C. § 876(c), and therein the Court found, pre-*Elonis,* that the objective test for determining whether a communication is a true threat **does not** consider the subjective intent of the speaker. The ruling is, thus, inapposite to the analysis herein. *Mabie*, 663 F.3d at 333; see also Report at page 7, 8 and 11.

As for the Report's reliance on United States v. *Sutcliffe*, 505 F.3d 944, 953-54 (9th Cir. 2007), this reliance is also misplaced. *Sutcliffe* is a pre-*Elonis* decision wherein the Court rejected the Defendant's argument "…that § 875(c) is void for vagueness because the statute itself neither requires specific intent nor defines true threats." *Id*. In *Sutcliffe*, the Court did however affirm a conviction under 18 U.S.C. § 875(c), and found that such required specific intent to threaten. 505 F.3d at 952, 960–61. However, in extrapolating how this could be alleged to be proven, the Court, pre-*Elonis*, found the standard to not be confined to an "…examination of subjective intent to the defendant's statements alone." This now incorrect *mens rea* standard was

exposed when cited by the same Court (9th Circuit in *United States v. Bagdasarian*, 652 F.3d 1113, 1123 (9th Cir. 2011),[10]

> As with our analysis of the objective test, we do not confine our examination of subjective intent to the defendant's statements alone. Relying on *United States v. Sutcliffe,* 505 F.3d 944 (9th Cir.2007), the Government points to the two facts that we discussed in our analysis of objective understanding as evidence that Bagdasarian intended to make a threat: (1) that he was later found to possess a .50 caliber gun like the one he mentioned in the "Obama fk the niggar" posting, and (2) that the Election Day email referred to the use of "a 50 cal on a nigga car." Neither fact is sufficient to prove beyond a reasonable doubt that Bagdasarian intended to make a threat when, two weeks before Election Day, he posted the two statements for which he was indicted.

Allowing for a combined objective-subjective test for intent is not only not allowed currently, post-*Elonis*, but such has engendered an overbroad and vague set of elements, especially as applied herein.

More correctly and relying on *Black*, Ms. Yassin, in her prior pleadings, noted that the statute is overbroad because it applies to any communication regardless of whether the sender subjectively intended to threaten or intimidate, which effectively outlaws a substantial amount of protected speech. The Report however rejects this interpretation of *Black*. In the Report, a pre-*Elonis* view of *Black's* requirements is utilized:

> In determining whether statements constitute a true threat, courts look at the statements from the point of view of the recipient and analyze the context in which they were spoken; the subjective intent of the speaker does not come into this First Amendment analysis. *See id.* at 1061-62; *see also Virginia v. Black*, 538 U.S. 343, 359 (2003) ("'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to

---

[10] In *Bagdasarian*, the Court 652 F.3d 1113, 1123-1124, held that the Defendant's statements failed to meet the subjective element of 18 U.S.C. § 879, given any reasonable construction of the words in his postings, those statements do not constitute a "true threat," and they are therefore protected speech under the First Amendment. (citing *Black,* 538 U.S. at 359, 123 S.Ct. at 1536).

commit an act of unlawful violence to a particular individual or group of individuals[.]"); *United States v. Mabie*, 663 F.3d 322, 333 (8th Cir. 2011) (stating that the objective test for determining whether a communication is a true threat does not consider the subjective intent of the speaker).

However, this interpretation of *Black* cannot withstand even a cursory reading of the opinion and the current standard of intent pursuant to *Elonis*. In *Black*, the Court evaluated the constitutionality of a Virginia law that banned cross burning done with the intent to intimidate. The law was coupled with a prima facie evidence provision and jury instruction noting that the intent to intimidate could be inferred from the act of cross burning itself. Although the Court noted that a state may proscribe cross burning where there is an intent to intimidate, it also found that the law—when combined with the jury instruction—allowed for the prosecution and conviction of defendants who burned crosses for political or religious reasons, and was, therefore, facially unconstitutional. *See Black*, 538 U.S. at 362–364; *Elonis*, 135 S. Ct. at 2012 (the *mens rea* requirement under § 875(c) is met if "the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat.")

The Court further explained that it was the intent of the cross burner that proved dispositive in the constitutional inquiry:

> The act of burning a cross may mean that a person is engaging in constitutionally proscribable intimidation. But that same act may mean only that the person is engaged in core political speech.. . . As the history of cross burning indicates, a burning cross is not always intended to intimidate. Rather, sometimes the cross burning is a statement of ideology, a symbol of group solidarity. It is a ritual used at Klan gatherings, and it is used to represent the Klan itself. Thus, "[b]urning a cross at a political rally would almost certainly be protected expression." Indeed, occasionally a person who burns a cross does not intend to express either a statement of ideology or intimidation. Cross burnings have appeared in movies such as Mississippi Burning, and in plays such as the stage adaptation of Sir Walter Scott's The Lady of the Lake.

18

The prima facie provision makes no effort to distinguish among these different types of cross burnings. It does not distinguish between a cross burning done with the purpose of creating anger or resentment and a cross burning done with the purpose of threatening or intimidating a victim. It does not distinguish between a cross burning at a public rally or a cross burning on a neighbor's lawn. It does not treat the cross burning directed at an individual differently from the cross burning directed at a group of like-minded believers. It allows a jury to treat a cross burning on the property of another with the owner's acquiescence in the same manner as a cross burning on the property of another without the owner's permission.

It may be true that a cross burning, even at a political rally, arouses a sense of anger or hatred among the vast majority of citizens who see a burning cross. But this sense of anger or hatred is not sufficient to ban all cross burnings. As Gerald Gunther has stated, "The lesson I have drawn from my childhood in Nazi Germany and my happier adult life in this country is the need to walk the sometimes difficult path of denouncing the bigot's hateful ideas with all my power, yet at the same time challenging any community's attempt to suppress hateful ideas by force of law." The prima facie evidence provision in this case ignores all of the contextual factors that are necessary to decide whether a particular cross burning is intended to intimidate. The First Amendment does not permit such a shortcut.

*Id.* at 365–67 (citations omitted).

The Virginia statute at issue in *Black* and § 875(c) are indistinguishable with respect to the First Amendment analysis. Just as the First Amendment protects the act of cross burning where the state has not proven intentional intimidation, it also protects the transmission of a communication that contains threatening language where the subjective intent to intimidate is absent. But a Klansmen who held a virtual political rally during which he broadcast the image of a burning cross could be tried in the Eleventh Circuit and convicted under § 875(c)—in contravention of the First Amendment—if the jury found his message to be threatening under an objective standard.

It is clear from *Black* that the First Amendment limits any ban on threatening speech to those cases where the speaker intends ***her*** speech to threaten or intimidate. Because § 875(c)—as

19

interpreted by the Eighth Circuit—applies to a substantial amount of speech outside this acceptable zone of proscription, it is facially overbroad and the indictment against Ms. Yassin must be dismissed.

## II. Count One.

The Supreme Court has explained that there are two types of conspiracy statutes: those that are modeled after 18 U.S.C. § 371, which requires an overt act, and those that are modeled after the common law of conspiracy, which does not require an overt act. *Whitfield v. United States*, 543 U.S. 209, (2005). Section 371 reads as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both" 18 U.S.C. § 371 (emphasis added)

To indict a defendant with conspiracy, the government must charge that: (1) there was an agreement to violate the law; (2) the defendant knew the essential objective of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, (4) an overt act was committed in furtherance of the conspiracy, and (5) the coconspirators were interdependent. 18 U.S.C.A. § 371. As discussed above, the allegations in the Superseding Indictment and the Report's findings and conclusions are incorrect as to any allegation by this Defendant of intent, which would negate any possibility that elements 1, 2, 3, 4 and 5 above can be found.

Count One appears to charge the following criminal objectives: to commit the crime of solicitation to commit a crime of violence in violation of 18 U.S.C. § 373. (Doc. # 73). There are no allegations in the Superseding Indictment or the Report that allege an agreement by the

Defendant, when or where any such agreement was made, that the Defendant knowingly participated in the conspiracy, and how she was interdependent with others.

Although "[I]t is well settled 'that a substantive crime and a conspiracy to commit that crime are not the same offense.' " *United States v. Mullins,* 613 F.3d 1273, 1287 (10th Cir.) (quoting *United States v. Felix,* 503 U.S. 378, 389, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992)) (footnote omitted), *cert. denied,* ─── U.S. ───, 131 S.Ct. 582, 178 L.Ed.2d 425 (2010). "The essence of any conspiracy is the agreement or confederation to commit a crime." *United States v. Bedford,* 536 F.3d 1148, 1155 (10th Cir.2008) (internal quotation marks and citation omitted), *cert. denied,* ─── U.S. ───, 129 S.Ct. 1359, 173 L.Ed.2d 620 (2009). "[W]hen 'a defendant is charged in more than one count, venue must be proper with respect to each count.'" *United States v. Tingle,* 183 F.3d 719, 726 (7th Cir.) (quoting *United States v. Granados,* 117 F.3d 1089, 1091 (8th Cir.1997)), *cert. denied,* 528 U.S. 1048, 120 S.Ct. 584, 145 L.Ed.2d 486 (1999). "Courts must perform a separate venue analysis for the substantive crimes and the conspiracy, even if the substantive crimes are committed in furtherance of the conspiracy." *Granados,* 117 F.3d at 1091 (citing *United States v. Corona,* 34 F.3d 876, 879 (9th Cir.1994)); *see also United States v. Mikell,* 163 F.Supp.2d 720, 727 (E.D.Mich.2001). The law seems settled that courts do not collapse the venue determination for the conspiracy count with that done for the substantive crime count. Defendant asserts that the government can offer the Court no citations of authority, nor persuasive reasons for following a different rule.

Nowhere in the Superseding Indictment or the Report is it alleged where, how or what the specific terms of agreement are as to the Count One alleged conspiracy. Thus, venue cannot be found in the Western District of Missouri and all of the elements of a conspiracy are not

Case 6:16-cr-03024-MDH   Document 104   Filed 03/22/17   Page 21 of 25

sufficiently pled.[11]  "[T]he precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects." *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942). "To determine the scope of the alleged conspiratorial agreement, the court is bound by the language of the indictment." *United States v. Qayyum,* 451 F.3d 1214, 1218 (10th Cir.2006) (internal quotation marks and citation omitted). No agreement is specifically alleged in the Superseding Indictment and, thus, the Report is incorrect in finding that all elements of the offense in Count One are met herein.

The Report also finds that Count One sufficiently states an offense,[12] which is incorrect. The offense in Count One is conspiracy, which is an inchoate crime.  The boundaries of such charge are vague. In order to survive constitutional challenge, courts have concluded that the conspiracy must be defined by the terms of an essential agreement between and among the co-conspirators. Defendants must have the "basic intent to agree" and "the more traditional intent to effectuate the object of the conspiracy," *United States v. Gypsum Co*., 438 U.S. 422, n.20 (1978). The Report does not (and cannot) specifically identify either type of intent in its findings as to Ms. Yassin's alleged conduct in this matter, even if all allegations within the Superseding Indictment are taken as true.  At the most, the allegations in the Superseding Indictment as to

---

[11] Although venue is not the focal point in most criminal matters, it is "not a mere technicality." [*United States v.*] *Miller,* 111 F.3d [747] at 749 [ (10th Cir.1997) ]; *see also United States v. Winship,* 724 F.2d 1116, 1123 (5th Cir.1984) ("Appellants raise more than a pedantic, justice-defeating technicality in asserting venue related rights." (internal quotation marks and footnote omitted)). It is a constitutional consideration and an element of every crime. *Miller,* 111 F.3d at 749. Specifically, the U.S. Constitution, in Article III, Section 2, Clause 3, "requires that the trial of any crime be held in the state in which the crime was committed," and the Sixth Amendment "guarantees trial by a jury of the state and district in which the crime was committed." *Id.* (internal quotation marks omitted) (quoting *United States v. Medina–Ramos,* 834 F.2d 874, 875–76 (10th Cir.1987)). The Federal Rules of Criminal Procedure also address venue, providing for prosecution in the district where the offense occurred, unless a statute or other permissive procedure allows for another venue. *See* Fed.R.Crim.P. 18.

[12] Doc. # 101 at p. 14.

conduct alleged to be that of Ms. Yassin can only be taken as the reporting of the statements of others. That is not a sufficient overt act to constitute participation in a conspiracy. The Report incorrectly states that Ms. Yassin "made" statements. The Superseding Indictment does not even allege that she made her own statements, which was discussed more thoroughly herein above.

The Report (and the Superseding Indictment) as to Count One provides no information regarding the facts which form the basis of any conspiratorial agreement. Instead, it charges only broad time periods under which the conspiracies are alleged, and no specific facts to show what the terms of any explicit agreement was or when it was made. Indeed, it is completely unknown whether the grand jury was even presented any fact outlining the extent of the charges, the members of the alleged conspiracy, or any additional overt acts alleged to have been committed by Ms. Yassin, other co-conspirators or by whom they were committed. The Report does not address Ms. Yassin's Fifth and Sixth Amendment rights that Defendant has alleged are in jeopardy by the Government's pleading.

Moreover, given that Count One only relates to the underlying allegations in Counts 2 and 3, such charge should also be dismissed. Because the allegations as to Counts 2 and 3 constitution a non-offense, the conspiracy count based on such allegations should also be dismissed as superfluous. *United States v. Kramer*, 499 F.Supp.2d 300 (E.D.N.Y. 2007).[13]

Here, the overt acts contained within the Superseding Indictment are non-offenses with regard to Ms. Yassin. Even assuming the proof at trial comports with what the Superseding

---

[13] "The Court notes that the charge under the general conspiracy statute, 18 U.S.C. § 371, was superfluous, given that the 18 U.S.C. § 894(a) criminalizes the underlying offense as well as the conspiracy to commit the underlying offense. *See United States v. Smith*, 464 F.2d 1129, 1134 (2d Cir.1972); *United States v. Papia*, 399 F.Supp. 1381, 1385 (E.D.Wis.1975)." Defendant asserts in the case at bar, one of the underlying statutes charged in Counts 2 and 3, 18 U.S.C. § 2, has the same superfluous effect as to the Count One charge herein, 18 U.S.C. § 371.

Case 6:16-cr-03024-MDH   Document 104   Filed 03/22/17   Page 23 of 25

Indictment charges and the United States has represented, it would be insufficient to constitute a crime under 18 § 875(c), 18 § 2, or 18 U.S.C. § 371. See Kramer, 499 F.Supp 2d at 305. Thus, just as the Court in *Kramer* found when following the steps required by Fed.R.Crim.P. 12(b)(2), the Superseding Indictment must be dismissed:

> Federal Rule of Criminal Procedure 12(b)(2) permits a criminal defendant to raise by pretrial motion "any defense, objection, or request that the court can determine without a trial of the general issue." A court faced with a motion to dismiss must ask, first, whether the indictment states an offense, and second, whether the indictment is sufficiently specific to provide notice and allow the defendant to plead double jeopardy in a subsequent case. *See United States v. Sierra–Garcia,* 760 F.Supp. 252, 258 (E.D.N.Y.1991). Here, the overt acts contained within the superseding indictment are non-offenses with regard to Alhababi. The superseding indictment alleges that Alhababi was aware that another individual, Kramer, was holding passports and travel documents as security on loans on which Alhababi made collections. There is not the slightest suggestion in the superseding indictment or in any of the United States's responses to defense counsel or this Court that Alhababi took part in or conspired to take part in any effort to collect debt by force or threats of violence. At every turn, with respect to Alhababi, the United States has pointed singularly and exclusively to Alhababi's knowledge that Kramer held the travel documents and passports of debtors on loans that Alhababi participated in trying to collect on without resort to extortionate threats—or, from the United States's perspective, extortionate threats additional to the holding of documents. Assuming the proof at trial comports with what the superseding indictment charges and the United States has represented, it would very clearly be insufficient to constitute a crime under 18 § 894(a)(1) or 18 U.S.C. § 371. Accordingly, all charges against Alhababi, as alleged in Counts Five and Six of the superseding indictment returned on September 29, 2006, are dismissed.

Id. at 305-306.

Applying the Rule 12(b) steps above to the case of Ms. Yassin, if it is assumed that the proof at a trial of this matter would comport to the allegations in the overt acts or Counts One,

Two and Three of the Superseding Indictment, such would be insufficient as a matter of law to show any actions are **her** part that would constitute an offense.

WHEREFORE, Defendant Yassin respectfully requests that the Court sustain her objections to the Report, and dismiss the Superseding Indictment pending against her in this case.

Respectfully submitted,

*/s/ Ian A. Lewis*
**IAN A. LEWIS, #52819**
Assistant Federal Public Defender
901 St. Louis Street, Suite 801
Springfield, Missouri 65806
(417) 873-9022
Attorney for Defendant

March 22, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants in this case and a copy was mailed, via the United States Postal Service, to all non-CM/ECF participants.

*/s/ Ian A. Lewis*
**IAN A. LEWIS**

Case 6:16-cr-03024-MDH   Document 104   Filed 03/22/17   Page 25 of 25