UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,                )
                                         )
                Plaintiff,               )
                                         ) Case No.
                vs.                      ) 16-CR-3024-MDH-1
                                         )
                                         )
SAFYA ROE YASSIN,                        )
                                         )
                Defendant.               )


                        SENTENCING
         BEFORE THE HONORABLE M. DOUGLAS HARPOOL
             THURSDAY, JUNE 7, 2018; 9:32 A.M.
                   SPRINGFIELD, MISSOURI


APPEARANCES:

FOR THE PLAINTIFF:           MR. ABRAM MCGULL, II
                             UNITED STATES ATTORNEY'S OFFICE
                             901 St. Louis, Ste. 500
                             Springfield, MO  65806

                             MR. BRIAN PATRICK CASEY
                             UNITED STATES ATTORNEY'S OFFICE
                             400 E. 9th Street, Ste. 5510
                             Kansas City, MO  64106

FOR THE DEFENDANT:           MR. IAN A. LEWIS
                             FEDERAL PUBLIC DEFENDER'S OFFICE
                             901 St. Louis, Ste. 801
                             Springfield, MO  65806

COURT REPORTER:              MS. JEANNINE RANKIN, RPR, CSR
                             UNITED STATES DISTRICT COURT
                             222 N. Hammons Parkway
                             Springfield, MO  65806


     Proceedings recorded by mechanical stenography;
transcript produced by computer.

USA v SAFYA ROE YASSIN

CASE NO. 16-3024-CR-MDH-1

3    SENTENCING

4    June 7, 2018

5    *   *   *   *   *   *

6    THE COURT:  We are here for the sentencing of

7  Ms. Yassin.  Who appears on behalf the United States?

8    MR. CASEY:  Brian Casey and Abe McGull on behalf of

9  the United States, Your Honor.

10    THE COURT:  All right.  And on behalf of the

11  defendant?

12    MR. LEWIS:  Ian Lewis for the defense, Your Honor.

13    THE COURT:  Ms. Yassin, if you would stand.

14    You may recall, my name's Doug Harpool.  I'm a

15  federal district judge and it's my job and duty this morning

16  to sentence you for the crimes that you've admitted.  The law

17  instructs me to sentence you to a sentence which is sufficient

18  but not greater than necessary to meet the objectives of the

19  U.S. sentencing laws.

20    Because I am to consider those laws in our

21  sentencing, the first thing we'll do is the lawyers and I will

22  talk about the laws and see if we can agree on what the law

23  provides.  The first source of law, of course, would be the

24  congressional enactment that created the crime and the

25  sentence that they authorized for someone who committed the

2

1   crime.

2            The second source of law we'll look at will be the

3   U.S. Sentencing Manual adopted by the U.S. Sentencing

4   Commission.  We'll see what the guideline sentence would be if

5   you were to be sentenced according to that guideline.  The

6   U.S. Supreme Court has instructed district judges like me to

7   calculate the sentencing guideline in every case in every

8   court across the country.

9            Thirdly, the lawyers and I will consider the source

10  of law which is the other sentencing statutes generally, the

11  factors that we are to consider.  Those are contained in Title

12  18, Section 3553(a), and we will consider those factors.  And

13  the lawyers will make their argument and their presentation to

14  me, they'll make recommendations what your sentence should be,

15  explain why.

16           When we've gone through all the sources of law --

17  and in that last category, by the way, they'll argue facts and

18  circumstances because those are all among the relevant factors

19  in sentencing.

20           When all that's done, I'm going to give you a chance

21  to say something to me, if you want to.  Under the laws of

22  this country you don't have to say anything, but if there's

23  something that you want to say, I'll want to hear it before I

24  make a final decision.

25           Before I've entered the courtroom I've read

3

1  everything that has been submitted to me.  I'm familiar with
2  your case.  But I've not made a final decision on what your
3  sentence should be and I won't make that final decision until
4  we've gone through each of the steps I've told you about.
5          Do you understand the process we're going to follow?
6          THE DEFENDANT:  Yes.
7          THE COURT:  Now, one of the things I read is your
8  presentence investigation report.  Have you read that?
9          THE DEFENDANT:  Yes.
10         THE COURT:  And gone through it with your lawyer?
11         THE DEFENDANT:  Yes.
12         THE COURT:  Be seated, then, and we'll get started.
13         THE DEFENDANT:  Okay.
14         THE COURT:  The defendant is here to be sentenced on
15  Counts 2 and 3.  Count 2 and 3 are both –– or each, I should
16  say, perhaps, aiding and abetting the transmission of
17  interstate threatening communications in violation of 18
18  U.S.C. Section 875(c) and 2, Class D felonies.  Each of the
19  counts carry with it, as I understand the law, a sentence of
20  not more than five years in prison, a fine of not more than
21  $250,000, supervised release of not more than three years,
22  payment of $100 special assessment.
23         Any disagreement that that is the penalty that this
24  –– the authorized penalty that this defendant faces on each of
25  the counts?

4

| 1 | MR. LEWIS:  Not from the defense, Your Honor. |
| 2 | MR. CASEY:  Not from the United States, Your Honor. |
| 3 | THE COURT:  So that's what the statute authorizes |
| 4 | for your punishment. |
| 5 | The next step I told you about we will talk about is |
| 6 | the U.S. Sentencing Guidelines.  Your presentence |
| 7 | investigation included a calculation of your guideline |
| 8 | sentence and it concluded that as the guidelines are |
| 9 | calculated your offense level should be established at a 31 |
| 10 | and your criminal history at a six.  I will tell you that 31, |
| 11 | the highest you can be is 43, and that a criminal history six |
| 12 | is the highest that you can be. |
| 13 | Are there objections which the Court needs to take |
| 14 | up and consider regarding the presentence investigation |
| 15 | determinations? |
| 16 | MR. LEWIS:  Not from the defense, Your Honor. |
| 17 | MR. CASEY:  Not from the United States, Your Honor. |
| 18 | THE COURT:  I notice that the defense had some |
| 19 | objections.  Those were more to the policy rather than the |
| 20 | calculation; is that fair to say? |
| 21 | MR. LEWIS:  That's true, Your Honor.  They do not |
| 22 | affect the guideline calculation. |
| 23 | THE COURT:  All right.  So the Court will adopt an |
| 24 | offense level of 31 and a criminal history category of six. |
| 25 | Ms. Yassin, I know this has probably been explained |

5

1    to you but on the record I want to make sure I've explained it

2    to you.

3         The way the U.S. Sentencing Guidelines work is we

4    are to calculate an offense level and it can be as low as one,

5    as high as 43.  You use all kinds of numbers in this book and

6    you start with a base offense and you add for -- based on the

7    circumstances of a particular crime.  As we said, using that

8    we all agree that 31 will be the number assigned to you.

9         We then look at criminal history category and that's

10   based on your history and what you've done.  The way the

11   guideline works in this case is you have a criminal history

12   six.  Now, that's the highest possible.  We only recognize six

13   categories.  I should explain -- as your lawyer probably

14   has -- the Congress instructed the sentencing commission

15   basically to -- and this is an oversimplification, but if it's

16   a terrorist act, allegedly, then you're placed in category

17   six.  So it's not an exact calculation based on any past crime

18   that you may have committed but because of the nature of this

19   crime it's placed in category six.

20        We then look at a table in the back of the book and

21   you go over to the six column and you go down to the 31st

22   number and you look at the two of them together and for you

23   your sentence would actually be between 188 and 235 months

24   under the guidelines, but that's more than the authorized

25   punishment.  The authorized punishment is just 60 months per

6

count or a total of 120 months.  So the guideline sentence I
will adopt for you is 120 months.

Now, let's talk about other factors relevant to
sentencing.  Again, I've read everything submitted to me.  I
read some letters in support, I've read the lawyers' legal
suggestions.

Any presentation the government wishes to make
regarding sentencing may do so at this time.

MR. CASEY:  Thank you, Your Honor.

Your Honor, in this case the defendant has pled
guilty to a very serious federal offense.  At its core the
crime here is this defendant aided and abetted the foreign
terrorist organization ISIS in bringing its campaign of terror
to the United States.

In many ways, Your Honor, this is a new crime.
ISIS, being a enterprising organization, found a new way to
reach people and to reach people in foreign lands and that was
through the use of social media.  This defendant played a key
role in their campaign to use social media to terrorize the
United States and United States citizens and undermine the
national security of this country through doing that.

This defendant basically made herself a full-time
job of creating websites or Twitter accounts to promulgate
ISIS propaganda on the internet.  And when a wave of these
ISIS public information -- personal identifiable information

7

became available, she found a way to put it out, to help ISIS put it out, and put it out along with threats hoping to incite people. Her own words is that she acted to incite, hoping to incite people to go and do harm to people, to individuals simply because they were in the U.S. military or they worked for U.S. law enforcement.

I know that the Court has read the submissions and so I will take some time at the end to go over the 3553 factors but I wanted to start with some of the points raised in the defendant's sentencing memo, to respond to some of them.

The first point I want to begin with is that the defendant's sentencing memo asks for a variance below the guidelines because -- I believe the argument is anything besides a variance wouldn't give this defendant the benefit of her plea.

Your Honor, I think that that's simply not a proper factor. It's not one of the 3553(a) factors and I don't think this Court should be looking at plea negotiations in deciding whether -- what an appropriate sentence is. But because the defendant has raised it, I do believe that the Court needs more information in order to evaluate that point. As I said, it's not a proper factor and so the Court should give it little or no weight, but let's look at this plea.

The defendant was facing three counts. One of those

8

counts was conspiracy to solicit a crime of violence. That was the count that as part of this plea the United States agreed to drop. That count, while only a five-year felony, it would have increased the defendant's total exposure to 15 years but also that count under the guidelines would have had a recommendation of life. Had the defendant pled guilty to all three counts, she would be in front of this Court with a 180-month statutory max and a guideline recommendation of life. So she's received a significant benefit already by making this plea.

In addition, as Mr. Lewis knows, the United States had informed him that were this defendant to have gone to trial, the United States would have added two substantive counts, soliciting a crime of violence in violation of 18 U.S.C. Section 373. Each of those counts would have been 20-year statutory max counts. So that if the defendant had gone to trial, she would have been looking at 55 years of statutory exposure and after trial her guidelines would likely have been also life.

THE COURT: If she was found guilty.

MR. CASEY: Were she found guilty, correct.

So that is the benefit of this defendant's plea.

The defendant says that the Court needs to give her a variance in order to give her the benefit of the plea but the reality is because the statutory maximum is only 120

9

months, she's already receiving a significant variance from
the guidelines from this plea.

            THE COURT:  Isn't that just because the Congress
arbitrarily decided everybody should be a criminal six?

            MR. CASEY:  It wasn't arbitrary, Your Honor.  It
wasn't arbitrary whatsoever.

            THE COURT:  Didn't the sentencing commission just
immediately go to six without any type of hearings or analysis
of sentencing policy?

            MR. CASEY:  Well, Your Honor, this is a provision
that is on the better part of 15 years old and every Court
that's looked at it has agreed that it's appropriate,
including the Eighth Circuit.

            THE COURT:  Didn't Mr. Lewis cite several cases in
his brief where people did not get the credit for the criminal
history six?

            MR. CASEY:  He did cite a few cases, Your Honor.
I'd like to speak to them.

            THE COURT:  Eighth Circuit cases?

            MR. CASEY:  No, not at all.  They were district
court cases, one from the Southern District of New York and
one from the Eastern District of Virginia.  They were both
from 2007.  And in the sense of this guideline we could call
them cold cases because they were when Courts were first
beginning to look at how this terrorism enhancement applies.

Case 6:16-cr-03024-MDH   Document 136   Filed 06/28/19   Page 10 of 63

1   There's no newer cases.  These are kind of outlier cases.  So
 2   in the ten years that have passed, as terrorism enhancement
 3   cases have gone through the courts, you've not seen Courts go
 4   back to this type of analysis.

 5        Both of those cases, it's the *Aref* case and the
 6   *Benkhala* case, are cases where the district court said if the
 7   criminal history's six, we're going to depart down from
 8   because there's absolutely nothing in this person's criminal
 9   history.  And it's not the case of the person was just no
10   criminal history points or category one but that there was
11   nothing there.  There was no arrests.  There were no contacts.
12   There was found to be aberrant behavior.

13        With this defendant that is not the case.  While her
14   conviction being old didn't lead to criminal history points,
15   it was the same behavior.  It was threatening behavior.  Her
16   prior California conduct, as this Court knows from the --

17        THE COURT:  Wasn't it a personal domestic dispute
18   with the father of her child?

19        MR. CASEY:  It was personal domes- --

20        THE COURT:  Nothing to do with politics or ISIS or
21   anything like that?

22        MR. CASEY:  Well, it did have to do with threatening
23   violence, Your Honor.  And this is a threat of violence case
24   and that case also involved threats of violence.  I believe it
25   was a threat to behead the father of her child.

1                 And so the point being, this isn't an extraordinary

        2     case where there's no prior criminal conduct, and that's what

        3     both of those cases, *Aref* and *Benkhala*, held.  No prior --

        4     they said it was extraordinary it would have done this, so

        5     aberrant in both of those cases.  Not here.

        6                 THE COURT:  In those cases wasn't there -- one

        7     person was actually funding ISIS operations, am I right?

        8                 MR. CASEY:  That's correct, Your Honor, yes.  It

        9     wasn't ISIS.  It would have been Al-Qaeda at the time.

        10                THE COURT:  Right, at that time it would have been a

        11    different organization.

        12                MR. CASEY:  Different organization.

        13                THE COURT:  Let me ask you about her conduct in this

        14    case.  I understand that she put information about U.S. law

        15    enforcement and military people on the internet.  Was she the

        16    only one doing that for ISIS or were there others doing it?

        17                MR. CASEY:  There were others, Your Honor.

        18                THE COURT:  Did any of those say military or law

        19    enforcement people, did anybody act on any of those threats?

        20    Were there any violence done to any of those as a result?

        21                MR. CASEY:  Not to the four individuals named as

        22    victims in this case.

        23                THE COURT:  All right.  Do we know whether she put

        24    their names out before or after others did?

        25                MR. CASEY:  In one instance it was -- well, I'm

                                          12

1   sorry, Your Honor.  It was roughly contemporaneous.  There

2   were several lists that put out and in one instance she put

3   the lists out like two weeks later.  Those were not lists that

4   she was charged for in this case.  The ones that she was

5   charged for in this case she was put out fairly

6   contemporaneous.

7            So how it worked was she was in direct contact with

8   an ISIS operative overseas.

9            THE COURT:  Right.

10           MR. CASEY:  And she knew when the lists were coming.

11  Twitter was acting very, very diligently in taking these

12  websites down.  So it was a very coordinated web.  So when the

13  ISIS person would be the first to know and when they would put

14  the information out, they relied on Ms. Yassin and others to

15  take that information and disseminate it to their followers

16  very quickly because these Twitter sites were coming up and

17  down very quickly.  But once it would get out to that second

18  level, and then the third level, and then the fourth level,

19  then the information was out.  Then it was viral.  And that's

20  how it -- that's how it sustained on the internet.

21           She played that very, very vital role of being the

22  person to pass it on to sometimes a thousand followers in

23  those hours it took for Twitter to catch up to them.

24           THE COURT:  You say a vital role.  Nothing ever

25  ended up happening, am I right on that?

1          MR. CASEY:  Your Honor, I'm not sure what you mean
2     by ended up happening.
3          THE COURT:  No one ended up ever facing injury or
4     even an attempt at injury, correct?
5          MR. CASEY:  Four people had to change their course
6     of lives to protect themselves and their families.  Very, very
7     real threats of peril.
8          THE COURT:  And now I want to get to that issue.
9     The -- and that's why I was asking you about how many people
10    was putting this information out, because had one person put
11    the information out they would have had to change their -- and
12    that's why I asked you the order in which it was put out.
13         MR. CASEY:  Okay.  She played a very vital role in
14    the ones that were charged in this case.
15         THE COURT:  I guess what I don't understand, when
16    you say vital role, you're not saying she sent the information
17    to others so they could disseminate it; you're saying that she
18    had followers that she disseminated it to?
19         MR. CASEY:  She -- both.
20         THE COURT:  Well, is she the one person in the
21    United States that ISIS sent this information to that then she
22    was the one that disseminated everywhere or did ISIS send it
23    to a lot of people and she was among the ones that got it?
24         MR. CASEY:  She was in direct conversation with
25    someone overseas who said, I'm going to publicly post this.

                              14

1    Once I publicly post it, will you then re-post it to people?

2                THE COURT:  None of that's answering my question.

3                MR. CASEY:  Well, Your Honor, I'm trying to explain

4    how it works.  There was, no -- I'm --

5                THE COURT:  Is she the single person in the United

6    States responsible for disseminating the information in the

7    United States and that all the communications went through

8    her, or did the communications go through dozens or hundreds

9    of people like her and she then was one of the people

10   disseminating the information to other people?

11               MR. CASEY:  Your Honor, my point is the information

12   didn't originate in the United States.  It originated from

13   overseas.

14               THE COURT:  I know that.  But someone was the first

15   person to try to get it up on the United States --

16               MR. CASEY:  She would have been among the first.

17               THE COURT:  All right.  And did the other people who

18   put it up, were they dependent on her relaying the information

19   to them or did ISIS directly communicate with those other

20   people also?

21               MR. CASEY:  I am not aware of ISIS -- of the ISIS

22   individual that directly communicated with this defendant with

23   her directly communicating with others.  I am not aware of

24   that.

25               THE COURT:  All right.  What about other ISIS people

                                  15

1   communicating with others?

2          MR. CASEY:  Well, Your Honor, there's other cases.

3   I mean, we're going to talk about three other cases where

4   there's similar conduct.  So, yes, there was a web of ISIS

5   operatives working at the --

6          THE COURT:  I just don't understand why you're being

7   so evasive.

8          MR. CASEY:  I'm trying to answer the questions.

9          THE COURT:  I want to know what role she played.

10  You keep saying it was a vital role and I'm trying to decide

11  what was it that made it vital.  And other than you say she

12  had direct communication within an ISIS operative -- and I

13  understand that -- and that she relayed their information to

14  her followers --

15         MR. CASEY:  Yes.

16         THE COURT:  -- what else was vital about it?

17         MR. CASEY:  She was one of the people that actively

18  over the course of several months worked around the clock to

19  keep this presence on Twitter available so that people who

20  wanted ISIS information would know where to go.  They would

21  find the Muslimah account and they would know that if an ISIS

22  kill list or an ISIS threat list came out, Muslimah would be

23  someone that would have it for them.

24         THE COURT:  All right.  I know she put out the name

25  of these four individuals.  What else did she do?

16

```
 1              MR. CASEY:  It was a very, very long history of
 2    putting out various types of --
 3              THE COURT:  I saw propaganda.  She put out something
 4    that was ugly about the president, Obama at the time.
 5              MR. CASEY:  That's correct.
 6              THE COURT:  But I want to know what -- she's accused
 7    of threats of violence, so I want to know what else she did
 8    that included a threat of violence.
 9              MR. CASEY:  Well, Your Honor, she put out other
10    types of kill lists.
11              THE COURT:  Okay.  That's what I'm trying to get you
12    to tell me about.
13              MR. CASEY:  Yes.  Absolutely.
14              THE COURT:  You had the four officers.
15              MR. CASEY:  The four officers, correct.
16              THE COURT:  What other kill list did she put up --
17    or four people, I should say.
18              MR. CASEY:  Right.  There were several others where
19    it would be long lists of U.S. military personnel and --
20              THE COURT:  And that would be names, addresses,
21    pictures?
22              MR. CASEY:  Names and addresses, yes.
23              THE COURT:  Pictures?
24              MR. CASEY:  Sometimes, correct.
25              THE COURT:  Go ahead.
```

17

1          MR. CASEY:  Those lists came out at various times.

2     Various reasons went into the charging decisions.  But she --

3     whenever she would be -- whenever a new wave of one of those

4     lists would come out -- or what would often happen is it would

5     be the same list sent out multiple times over the course of

6     from basically August to about December of 2015.  And she

7     would, you know, then republish it.  Some of those lists were

8     actually found on her hard drive after the search, so she had

9     saved them to be able to put them out later, which I believe

10    she did in December.  So that is -- it was a long, long string

11    of conduct that she was involved in.

12          THE COURT:  How many people, do you know, total were

13    disseminated?  Personal information about how many people

14    total?

15          MR. CASEY:  Hundreds, Judge.

16          THE COURT:  And they were law enforcement officers

17    and/or military people?

18          MR. CASEY:  That's correct, Your Honor.

19          THE COURT:  Tell me, I seem to recall -- and I can't

20    remember if it was in the presentence investigation or

21    elsewhere -- that she was contacted by law enforcement and

22    either warned or a discussion with her about her behavior?

23          MR. CASEY:  That's correct.  In June of that year

24    two FBI agents went to interview her and asked her if she was

25    the person putting out this information and she basically

18

1    denied that she ever did anything threatening but was aware

2    that they were aware of her conduct.  And at that point -- she

3    more or less moved at that point sort of full-time moved to

4    using these unanimous accounts.  The information that they had

5    were information they could trace back to her name.

6            THE COURT:  But it's the government's position that

7    she continued to disseminate after she was -- after she made

8    the denials to the FBI agents?

9            MR. CASEY:  Absolutely.  Well, she escalated,

10   actually.

11           THE COURT:  She did it a different way but she still

12   disseminated?

13           MR. CASEY:  Yeah.  I would say she escalated the

14   conduct.

15           THE COURT:  Go ahead.

16           MR. CASEY:  In getting back to those two cases you

17   mentioned about -- the two cases cited in the brief, I do want

18   to note that in those cases while the courts made a departure

19   under the guidelines on the criminal history, there were still

20   cases where both defendants got guideline sentences of 180 and

21   121 respectively.  So those cases were not this case in the

22   sense that they -- the Courts found them extraordinary.  There

23   was no prior criminal conduct at all.  That's not this case.

24   And, secondly, they still got sentences greater than what this

25   Court could even impose in this case.  So I think those cases

                              19

1    provide no ground for any type of departure or variance.

2         I think the Eighth Circuit's comment on this is

3    important.  The Eighth Circuit in *Ali* in 2015, quite recently,

4    adopted a statement made prior by the Second Circuit:  Even

5    terrorists with no prior criminal behavior are unique among

6    criminals in the likelihood of recidivism, the difficulty of

7    rehabilitation and the need for incapacitation.  And that's

8    the Eighth Circuit in accepting this move across the

9    guidelines to criminal history category six.

10        The next thing the defendant asked for in the memo

11   is a split sentence; 30 months and 30 months.  Your Honor,

12   this defendant is not entitled to a private prison.  Thirty

13   months of house arrest would be an extraordinary time of house

14   arrest and that would simply be passing the burden of

15   incarceration from the Bureau of Prisons, which is designed --

16   this country's agency for handling incarceration -- to the

17   local probation office.  There's no ground for that.  There is

18   no need to -- it would be -- it's an extraordinary request to

19   begin with but certainly no need for this defendant to be a

20   ward in a private prison and the burden be placed on the

21   probation office to incarcerate her.

22        This is a case where her time can be served in

23   Bureau of Prison time as the Bureau of Prison dictates and a

24   split sentence should not be accepted or even -- accepted by

25   this Court.

1      Lastly, the point made by the defendant I want to

2 address is the defendant cites family considerations as a

3 reason.  And as this Court knows, the guidelines don't include

4 family considerations as a factor.  And even under the --

5 under the guidelines to consider family considerations they

6 need to be unusual, be highly unusual or extraordinary even

7 for the Court to even consider them as a guidelines matter.

8 And as 3553 factors, typically Courts view that the same:

9 there needs to be something extraordinary for family

10 considerations to warrant a variance.  There's nothing

11 extraordinary in this case about the family considerations and

12 this individual's children.

13      The Court's aware from the detention hearing, the

14 prior record in this case, the condition of the home during

15 the defendant's arrest.  The Court's aware of the condition

16 that the children were in, is aware of the condition that the

17 children were living in at the time of the defendant's arrest.

18 The Court's aware of things such as jars of human waste found

19 in the children's room and the general status of disarray of

20 the home.  I think that's something when this defendant is

21 citing family considerations, this Court quite well knows what

22 at the time of arrest those children's family situation was

23 and they know how dire it was.

24      I think what is unique about this situation, Your

25 Honor, is that there is a family support system for these

21

1    children.  I know this Court oftentimes sees situations where
2    you're dealing with having to make the choice to incarcerate
3    single parents and having children becoming wards of the
4    state.  That's not the case here.  These children are
5    supported.  They are provided for.  There's nothing unusual
6    about the family considerations in this case that would
7    warrant any type of further variance than what the statutory
8    max has already created in this case.

9         Your Honor, the next factor I'd like to talk about
10   is deterrence.  I think deterrence is the key 3553 factor in
11   this case.  To put it bluntly, deterrence simply matters.
12   This is a new type of crime.  Social media is a new technology
13   that has enabled entirely new behavior and this behavior is
14   dangerous.  This behavior is a threat to the national security
15   in this country and this Court needs to impose a sentence that
16   sends that message.

17        With regard to general deterrence, this defendant
18   had followers.  There are copycats.  There are others who are
19   doing the same -- acting as agents for ISIS the same way this
20   defendant did on the internet that haven't been identified,
21   that haven't been caught, that are still actively acting and
22   they're paying attention to these cases.  Just like when the
23   defendant's devices were searched post-arrest, she had other
24   arrests -- she had saved other arrests, the facts of them, the
25   sentences imposed on her computer.  That's exactly what these

1   people are doing.  They are following this.  They are paying

2   attention.  A sentence of 120 months would send a message to

3   them.

4           We're not imposing your free speech rights.  We're

5   not stepping into your ideology.  But if you commit crimes, if

6   you try to terrorize United States citizens, that's a crime

7   and it will be punished.

8           THE COURT:  Is that also punished with regard to

9   white supremacists?

10          MR. CASEY:  Your Honor, absolutely.  If they're

11  committing a crime, I think any type of extremist

12  organization.  And there are -- a lot of the case law in these

13  types of threat cases, the early case law, including the white

14  cases out of the Seventh Circuit, are white supremacist cases.

15  It goes to any type of extremist.  But it's this ability to

16  anonymize, to act on the internet at no cost -- because these

17  are free services -- and use social media to incite people.

18  It's a behavior that this Court needs to send a message to

19  others who are inclined to do it, that you will be punished.

20  If you commit a crime for this, you will be punished and you

21  will be punished severely.

22          And this defendant -- with regard to specific

23  deterrence, this defendant has -- I know this Court has said

24  it was domestic violence but this defendant has in her record

25  evidence of violent tendencies, violent threatening

                                23

1    tendencies.  This isn't aberrant behavior.  This is a
        2    defendant that needs to know that you can't threaten violence
        3    against other people.  And a significant sentence to give a
        4    specific deterrence is needed in this case.
        5            The defendant with regard to specific deterrence,
        6    well, Judge, there's no need --
        7            THE COURT:  If a president were to say at a rally
        8    that you should beat the hell out of somebody else in the
        9    rally, would that be threatening and encouraging violence?
       10            MR. CASEY:  Your Honor --
       11            THE COURT:  Would that be a crime?
       12            MR. CASEY:  Unfortunately, that's a little too close
       13    to a historical example that I'm aware of for me to give an
       14    abstract example, Your Honor.  But I will say the
       15    circumstances in this case are that there was a very clear
       16    intent to threaten.  There was a very clear intent to incite.
       17    There was a very clear intent to terrorize.  That does make it
       18    a crime in this case.  She was actively communicating with a
       19    known ISIS operative to -- in order -- for the purpose of
       20    terrorizing people, completely innocent people simply because
       21    they worked for the United States of America.  That is an
       22    entirely different crime.  That is a very severe crime.
       23            These people have -- they had to make significant
       24    changes in their lifestyle.  They had to spend significant
       25    money to protect themselves.  They had to live under

                                    24

1  significant fear since that date.

2  And on deterrence the defendant's point is, Well,

3  Your Honor, there's no need for significant deterrence because

4  the ISIS individual that Ms. Yassin was acting in concert with

5  was -- has met her end and that ISIS individual was killed by

6  a drone strike and the United States announced that this

7  summer.

8  I think there's two things that are faulty about

9  that, Your Honor.  The first is that, as we've already

10  discussed, that one individual, while it was who this

11  defendant was in closest contact with, it wasn't the only ISIS

12  person that this defendant was getting information from.  It

13  wasn't the only person she was in contact with.  She was

14  involved in a huge web of inter-related people on the internet

15  who were actively working to get this propaganda out.

16  Propaganda and threats out.

17  THE COURT:  Is getting the propaganda out a problem

18  or just getting the threats out?

19  MR. CASEY:  Getting the propaganda out, Your Honor,

20  in the context of -- while itself is not a crime, it is both

21  what makes -- it's what aggravates the threatening -- it's

22  what makes the threatening crime a threatening crime and

23  aggravates it because you're inciting people.  You're

24  agitating people.  You're using these statements, these

25  propaganda statements to identify -- the people who like it

25

1    are your targets.  Those are the people who might act on some
2    threat of violence or some solicitation of violence.  You're
3    identifying your -- your -- your audience.  You're using it to
4    identify your audience.

5         And it's also priming them for it.  It's getting --
6    it's ginning them up.  It's getting them ready to actually act
7    on something.  So you create -- the propaganda creates the
8    violent situation, the solicitation or the threat of violence,
9    putting out and saying, Go kill this person, I want you to
10   kill this person, here's their address.  That's the crime
11   that -- the situation that's been created, we'll get people to
12   act on it.

13        So it all does go together, Your Honor.  It's part
14   of a -- it's part of a conditioning almost.  I think it is
15   behavior that in this case was -- became criminal, quite
16   clearly became criminal and the defendant needs to be punished
17   for it.

18        And the suggestion that there's no deterrence
19   because the ISIS operative is dead is just -- it just makes --
20   Your Honor, I don't track it.  It just makes no sense.  Her
21   ideology doesn't change because her one contact died.  Her
22   ideology, what she believes in, what she believes in,
23   supporting a foreign power against this country is still
24   there, and a stiff sentence is needed to deter that.

25        I've gone on at quite some length here, Your Honor,

1  so I'm going to go a little more quickly through the other

2  3553 factors but all of them indicate a 120-month sentence in

3  this case.

4          THE COURT:  Let me ask one thing on the deterrence

5  issue because I do think that's an important one on this

6  sentencing.

7          As I understand it, everything she did involved

8  social networks, communications through social networks.

9          MR. CASEY:  Correct, Your Honor.

10          THE COURT:  If her supervised release prohibits her

11  from owning or using a computer, does that not take care of

12  the deterrence issue with regard to her?  Obviously that would

13  have to be monitored and enforced.

14          MR. CASEY:  Well, Your Honor, I don't think it's

15  enough.

16          THE COURT:  And I'm not talking about punishment and

17  the other issues but just deterrence itself.

18          MR. CASEY:  I'm not sure, Your Honor, because what

19  it would take -- and this is something that came up during the

20  detention hearing also.

21          What it would really take to rely on just a

22  condition saying no computer is a significant level of

23  monitoring to be sure that she didn't access a computer.

24  Deterrence is achieved by incapacitation where she is not

25  allowed access to a computer because she's incarcerated.  And

27

1   that added level -- and there's case law that we cited in the

2   detention hearing level where it said courts do not have to

3   say -- do not have to make extraordinary conditions where

4   someone is being checked in on every day or their electronics

5   have to be monitored or their house has to have some sort of

6   dampener on it.  Courts don't have to do that.  You don't have

7   to go to those levels to keep someone off the computer.  And

8   that's what you'd have to do.

9         If you're relying simply on a special condition,

10  what it would take to enforce that condition would be so

11  onerous that this Court doesn't need to rely on that.

12        Incarceration will allow the same thing and create a

13  more -- a more -- a more -- a clear deterrence message.  If

14  the deterrence message is, Well, if you do it on the internet,

15  don't worry, it wasn't that bad, you won't go to jail, we'll

16  just take your computer away, that is not a clear, strong

17  deterrence message to others.

18        A clear, strong deterrence message is:  This is a

19  crime, it is a violent crime, it is a crime that needs to be

20  harshly punished with jail time.

21        This defendant, she still has followers.  There are

22  still people that are following the case of Muslimah.  There

23  are still people who pass around the postings and the

24  statements by Muslimah.  There are still people that will

25  know:  Muslimah, we know exactly what she did, we know she got

1    10 years for it.  That will send a very, very direct

2    deterrence message to those people.  And, Your Honor, I think

3    you would be shocked by the number that that is.  I think it's

4    a large number.  And so deterrence really does matter.  A

5    120-month sentence really will achieve that goal.

6            THE COURT:  You think the society that has suicide

7    bombers, that those people are going to be deterred by knowing

8    they have to spend 10 years in prison?

9            MR. CASEY:  Your Honor, they're not coming to U.S.

10   courts.  We're looking at people who are subject to United

11   States courts.  People who are subject to United States

12   federal court are absolutely deterred by 10 years in prison.

13           The other factors, Your Honor, I'm going to begin

14   with the nature of the offense.  Your Honor, I know the

15   question has been made about whether the victims suffered

16   physical injury, but there was real injury in this case.

17   There was real peril and potential for physical injury.  And

18   this offense was heinous.  It was a truly heinous, hateful act

19   by this defendant.

20           THE COURT:  Your brief asks for restitution.  Are

21   you --

22           MR. CASEY:  It does, Your Honor.

23           THE COURT:  -- you pursuing that?

24           MR. CASEY:  We are.  It was not objected to, is my

25   understanding.

```
 1              MR. LEWIS:  Not in the PSI.

 2              MR. CASEY:  Not in the PSR.

 3              MR. LEWIS:  I'll talk about that in my part.

 4              MR. CASEY:  Okay.  Well, my understanding was it was

 5     not objected to so I didn't go at length on it in the brief.

 6     Separately provide the legal authority for it.  Two of the

 7     victims did provide reimbursement information to the probation

 8     office.  All four of the defendants described in interviews

 9     the costs they took.

10              THE COURT:  I haven't got that.  Do you have that?

11     I have not seen any justification of your restitution amount

12     at all.

13              MR. LEWIS:  May I, Your Honor?

14              THE COURT:  Yeah.

15              MR. LEWIS:  The PSI -- I was confused about that

16     myself.  The PSI says that Victim 1 sent a letter to the

17     government and Victim 2 sent a letter to the probation office.

18     We were provided with the Victim 2 letter.  I have not seen

19     the Victim 1 letter.

20              MR. CASEY:  Victim 1 letter was attached to the

21     final PSR.

22              MR. LEWIS:  Well, there were two letters but only

23     one was attached to the PSR.

24              MR. CASEY:  I provided the probation office the

25     reimbursement material.
```

1          THE COURT:  I have the letter that's attached.  I

2   guess I'm trying to --

3          PROBATION OFFICER:  Your Honor, I do have a

4   declaration of victim losses.  It was just summarized in the

5   presentence report.  This was not provided to the Court but I

6   certainly can provide copies to the --

7          THE COURT:  I have one letter that I did look at but

8   it -- I guess I was thinking there would be some type of

9   documentation supporting what was in the letter.

10          PROBATION OFFICER:  That letter, Your Honor, was the

11   one that came directly from the government.

12          THE COURT:  Have other people been charged with

13   disseminating these people?  Were there any restitution orders

14   in any of those cases?

15          MR. CASEY:  With regard to -- I believe I mentioned

16   this in the sentencing memo.  With regard to Victim 2, no.

17   This was the only person -- this was the only defendant

18   charged.  This would be the only restitution.  I believe with

19   regard to Victim 3, there has been at least one other who has

20   been sentenced and ordered restitution.

21          THE COURT:  Do you know what the restitution order

22   was?

23          MR. CASEY:  I don't have that in front of me, Your

24   Honor.

25          THE COURT:  Or who was ordered it?

Case 6:16-cr-03024-MDH   Document 136   Filed 06/28/19   Page 31 of 63

1          MR. CASEY:  I believe it was the *McNeil* case but I

2     don't have the number in front of me.

3          THE COURT:  All right.  Were any of these reimbursed

4     by the government?

5          MR. CASEY:  No, Your Honor.

6          THE COURT:  So our government had our military

7     officers put at risk because of terrorist threats and we said,

8     You're on your own?

9          MR. CASEY:  The two military people were former

10    military at the time and I do not know how the military

11    addresses that, Your Honor.

12         THE COURT:  All right.  The number here is not the

13    number that you asked for.  I'm sure that included the other

14    defendant.

15         MR. CASEY:  The other victim, yes, Your Honor.

16         THE COURT:  Proceed.  We'll —

17         MR. CASEY:  I do know, having looked now, with

18    regard to Victim 2, her impact statement was included with the

19    PSR but the reimbursement sheet, the itemization of her costs

20    were not; however, it's summarized in the second-to-last

21    paragraph of her statement.

22         THE COURT:  That's the 7,057.27 and 1366 numbers?

23         MR. CASEY:  Correct, Your Honor.

24         THE COURT:  But that doesn't add up to the amount

25    you're asking for and that's what I'm —

                                    32

1      MR. CASEY:  Victim 3 is the additional, I believe,

2   13,000.  He provided that directly to probation.

3      THE COURT:  Proceed.  Go ahead.

4      MR. CASEY:  Back to the nature of the offense, Your

5   Honor.  Effectively, this is a defendant who acted as an agent

6   of ISIS in the United States.  Social media allowed that and

7   that's what this defendant did.  This was -- effectively, this

8   was an agent of a foreign terrorist organization acting in

9   this soil.  That is a very serious offense.

10      It is a new offense.  It is something that's newly

11   enabled through the wonders of social media but that's

12   precisely what this defendant did.  She acted anonymously and

13   she acted to -- because she -- these efforts to stay

14   anonymous, she was able to keep going for a very long time.

15   It was almost like a full-time job acting on behalf of ISIS.

16      And that constant flow of indoctrinating new people,

17   inciting new people and providing these threats and

18   solicitation of violence to new people did undermine the

19   United States' national security and is a very serious offense

20   that deserves very serious punishment.

21      Beyond that, social media doesn't have borders.

22   Just as the information was coming from overseas to her, her

23   information was going overseas.  She had affects across the

24   world.  She had followers across the world.  That's something

25   else that this Court needs to consider with the nature of that

                                33

offense. She sought to strike terror in these victims and she
did strike terror in these victims. The effect and the harms
of that are very far reaching. They're far reaching ways this
Court needs to consider when it's imposing a sentence.

She was part of a bigger movement but that bigger
movement needed her. This movement, this ISIS internet
campaign, the taking their war, taking their battle against
the United States to the internet, it required soldiers. It
required people who would voluntarily work.

And it was real work. It took real time for her to
create these accounts, to monitor other accounts, to follow
other accounts, to find them, to put the information out.
This was a full-time job for her. She volunteered her time on
behalf of a foreign terrorist organization. It needed people
like Ms. Yassin to give that time in order for them -- for
their new front in the battle, for the internet battle to
work. And she gladly, willingly did that on behalf of ISIS.

The Court knows -- moving now to the history and
characteristics of this defendant. The Court knows from the
PSR and the detention hearing, most of this is defendant's
relevant personal history. This wasn't her first threatening
conduct. Prior threats were threats of violence. She's had
several other -- you know, as the Court knows, several other
contacts with law enforcement.

As I've said before, the personal factors here, the

34

1  family factors, they aren't so unusual as to warrant a
2  variance or departure.  They're what this Court sees here in
3  every case.  It's a guideline sentence case.  There's no
4  reason to vary beyond the variance that's already provided as
5  part of the plea.

6          She decided to do this with a clear mind.  There was
7  no mental defect in this.  This is behavior that she clearly
8  and freely chose to do.  It was no act of passion.  There was
9  no in the moment.  This was a long, thought-out, calculated,
10 months-long campaign that she actively, daily cooperated in
11 and participated in.

12         While she said in her defense memo -- in defendant's
13 sentencing memo and I assume Mr. Lewis will mention that there
14 might be -- she may be physically limited.  Despite whatever
15 physical limitation, she found a way, she found her way to
16 support ISIS here in the United States.  That physical
17 limitation didn't stop her from committing this crime, it
18 didn't stop her from her conduct and it's not something this
19 Court should consider.

20         With regard to Court considering the guideline and
21 the statute, as this Court said, statutory maximum is 120.
22 That's the sentence the United States is asking for and that's
23 the guideline sentence.  The guidelines would recommend 188 to
24 235 months, roughly 15 to 20 years.  The statutory max
25 sentence here is between a 33 and 50 percent variance out of

Case 6:16-cr-03024-MDH   Document 136   Filed 06/28/19   Page 35 of 63

1  the gate.  It's a significant variance for this defendant,

2  significant variance for the defendant, as you said, it's the

3  benefit of her plea agreement but something the Court needs to

4  consider in deciding how do the guidelines weigh.  I think the

5  guidelines weigh here very strongly and a 120-month sentence

6  makes very good sense for all of the factors but including the

7  fact that not only is it a guideline sentence but the

8  guidelines actually would recommend significantly,

9  significantly higher.

10         And with regard to unwarranted disparities.  In the

11  defendant's sentencing memo, she mentions a number of 875(c)

12  cases and those were all threat cases.  I believe there were

13  eight of them.  In at least seven of them the Court either

14  imposed a guideline sentence or an above-guideline sentence.

15         Now, those sentences were lower because the

16  terrorism enhancement didn't apply.  But the defendant does

17  not object to the application of terrorism enhancement.  The

18  facts quite clearly show the terrorism enhancement applies and

19  Courts have consistently said that it applies appropriately

20  and that it wasn't -- as I've read in the Eighth Circuit

21  language, it wasn't a -- it wasn't caprice on behalf of the

22  sentencing commission; rather, it was acknowledging special

23  factors of these types of defendants:  that they are harder to

24  deter, they are harder to rehabilitate.  That is why the

25  terrorism enhancement exists and it's why it applies in this

36

1   case.

2          Just like all 875(c) cases the defendant cites,

3   here's another 875(c) case where this one should also impose a

4   guideline sentence.  All I read from defendant's seven cases,

5   eight cases, is that guideline sentences are typically imposed

6   in 875(c) crimes.  Here's another 857(c) crime, Your Honor.  I

7   think even though those cases quite factually state, they do

8   show the strength of the guidelines in making an appropriate

9   recommendation for these facts.

10          What cases do matter with regard to unwarranted

11  disparities are the three cases the government cites in its

12  memo: the *McNeil* case, the *Amin* case and the *Aziz* case.  These

13  are three individuals who are doing exactly what this

14  defendant did.  During the same time period, this 2015 time

15  period, they were acting similarly as agents for ISIS on

16  social media.

17          McNeil put out some of the same material that this

18  defendant put out, I believe some of the same conduct.  He got

19  20 years.  Aziz also put out some of the same kill lists as

20  this defendant; 160 months.  Amin, while he did it a little

21  different, he still was actively working -- you know,

22  advocating for ISIS on the internet, he was the lowest of

23  those three sentences at 136 months, but Amin cooperated.

24  After cooperation he still received a 136-month sentence.

25          The same individuals were doing the same conduct at

37

1  the same time frame as this defendant acting for ISIS on

2  social media to distribute these kill lists and distribute

3  these threat lists have received significant sentences.

4          THE COURT:  But there was other related conduct in

5  each of those cases.

6          MR. CASEY:  It's very similar conduct, Judge.

7          THE COURT:  Wasn't there financing by one of them?

8  One of them went out and scouted a location?

9          MR. CASEY:  That's true.  There were --

10         THE COURT:  More than just social media in those

11 cases, that's why the guidelines were higher, right?

12         MR. CASEY:  Well, the guidelines were higher in some

13 of the cases but also they were charged differently.  I don't

14 think -- again, I don't know that how the case was charged is

15 a factor we considered here.  Here I think we're looking at

16 the underlying conduct.  This is very similar conduct and

17 these were much more significant sentences.

18         I think in this case under these facts it goes to

19 show that 120 months would not create unwarranted disparities.

20 In fact, it would be -- it would be in line with how this

21 conduct has been sentenced by Courts.  It would avoid

22 unwarranted disparities.

23         Restitution I believe we've talked about.

24         So I'm just going to wrap up, Your Honor, by saying

25 at the end of the day this Court's mandate is to impose a

                                38

sentence that is sufficient but not greater than necessary to meet the goals of 3553(a)(2)(A); that is, reflect the seriousness of the offense, promote respect for the law and provide for just punishment. A 120-month sentence will reflect the seriousness of this offense, it will promote respect for the law, it will provide for this defendant just punishment.

As I've said, this is a very serious federal felony offense. The seriousness of the offense is heightened by the very real peril she put the victims in. At the time the defendant reposted the personal identifier information and threats, ISIS was actively soliciting persons in the United States to use those addresses for violent attacks. The threats to the victims were very real and the victims feared violence against themselves and their families were entirely justified. This defendant played an active and crucial role in assisting ISIS in spurring that fear and a 120-month sentence is the only available sentence that meets the sentencing factors that this Court is asked to consider.

THE COURT: Only the maximum allowable by law is the only sentence that does justice?

MR. CASEY: That's correct, Your Honor, in this case.

THE COURT: All right. Thank you.

Mr. Lewis.

39

1          MR. LEWIS:  Thank you, Your Honor.

2          Your Honor, my client's aunt -- who has stepped out

3  of the courtroom -- my client's aunt, Sandra Mick, had a

4  prepared statement that she wanted to read to the Court, Your

5  Honor.  I was going to do that before I get into my argument.

6          Do we know where Ms. Mick is?

7          I'm sorry, Your Honor, for the delay.

8          THE COURT:  That's fine.

9          MR. LEWIS:  Your Honor, we would ask Ms. Mick to

10 come to the lectern here for her statement.

11         MS. MICK:  I'm sorry, Your Honor.

12         THE COURT:  You need to state your name and spell it

13 for the court reporter.

14         MS. MICK:  Sandra, S-A-N-D-R-A, Mick, M-I-C-K.

15         THE COURT:  You may proceed.

16         MS. MICK:  Thank you.

17         Thank you for allowing me the opportunity to speak

18 on Safya's behalf.

19         Ms. Yassin is my niece.  Her mother is my sister,

20 was my sister.  She's deceased.  Safya is a good girl.  She's

21 had a rough life.  Her mother was extremely abusive to her.

22 She left her in California in foster care.  I got her back.

23 She's had a rough time.  She went to California to see her

24 father.  The man took her child from her.  Yes, she threatened

25 him.  What mother wouldn't threaten somebody over their child?

                                   40

1    I'm sure anyone would.  Follow through on it, no.

2             She's a good girl.  She's had a rough time.  She's

3    not a threat to our country.  She's never been out of this

4    country.  This is her country, too.  She's been a big help to

5    this family.  We've lost five family members from 2010 to

6    2014, including her mother.  She was by her side every minute

7    of a long, drawn-out death.  She was there.  Even though her

8    mother had mistreated her for years, she stayed with her

9    mother, took good care of her.  Took care of me.  I've had

10   surgeries.  She's been right there for me.  Every death she

11   was holding me up.  She's a good girl.  Made mistakes, yes.

12   Yes, she has.  She's paying dearly for it.  Her children are

13   paying.

14            I don't think she'll be a threat to anybody and I

15   beg the Court to show some mercy.

16            Thank you, Your Honor.

17            MR. LEWIS:  Your Honor, if it please the Court?

18            THE COURT:  Proceed.

19            MR. LEWIS:  Thank you.

20            Your Honor, I just want to reiterate that I am

21   asking this Court for a 60-month sentence on Counts 2 and 3, I

22   believe, to run concurrently to each other.  I am asking this

23   Court to split that sentence, 30 months in custody and 30

24   months of home detention.

25            I am not going to rehash my sentencing memo -- I

                                    41

1  think it went on probably too long —— but I do want to respond
2  to some of the things that were said today about it by the
3  government.

4          I just want to make the Court aware that at no point
5  in time did I state or think even now that there is no need
6  for deterrence.  I think this sentence, the statutory max on
7  both these counts, deters.  I think it is a deterring element.
8  I think it's specific to my client and I think it also is a
9  general deterrence.  It does say, You will receive the
10  statutory maximum sentence.

11         But this phrase kept coming back from the
12  government:  She deserves jail time.  Well, we agree.  We
13  completely agree.  And, actually, the sentence that I am
14  recommending to the Court is much longer than any other
15  sentence under 875(c) that we have dealt with in the Eighth
16  Circuit.  So we are not asking for a pass.  We're not asking
17  for a sentence that wouldn't comport to 3553(a)'s deterrence
18  or punishment.

19         But one thing that I think was missing from the
20  government's memo and the government's argument today except
21  for at the last five seconds the government actually said it:
22  Not more than necessary.  It's the only time they mentioned
23  it.  And I —— maybe as defense counsel, but I think that not
24  more than necessary is first among equals when it comes to the
25  factors of 3553(a).  That concept that we give the least when

1    we can, that is something that is enshrined by statute.

2           I mean, it's so important, it's not a guideline,

3    it's not a factor under Chapter 5, it is in the statute, built

4    in right there at the beginning.  Because the maximum sentence

5    in every case punishes.  And, yes, you can make the argument

6    that the maximum sentence in every case this Court would have

7    would deter -- even though I have my issues with whether or

8    not deterrence can even occur -- but, yes, you would be

9    punished.  Society would be safe if everyone got the maximum

10   sentence.  But that's not what the statute demands of us.  We

11   find the factors that are no more than necessary.

12          And let me go back to punishment.  Yes, 120 months

13   would punish her but we're not talking about punishment.  That

14   statute isn't talking about punishment.  It's talking about

15   just punishment.  That word alone highlights the entire

16   concept of we just don't mow people down, we just don't hit

17   them with the heaviest hammer we have.  We find a just

18   punishment.  And that punishment would recognize that my

19   client has voluntarily entered a plea of guilty and has

20   accepted responsibility for her actions.

21          Now, some of today's argument from the government

22   was talking about how I don't believe she got a benefit from

23   her plea agreement and about the plea agreement and about plea

24   negotiations.  That is not at all what I was saying.  She's

25   not -- getting a benefit for her plea of guilty, not the plea

                                    43

1   agreement.  The mechanisms that go into those agreements are
2   not a part of my argument today.

3          But this Court can look and see that what stands her
4   aside from the majority of 875(c) Eighth Circuit conviction,
5   what set her aside from the enhancements that we found in
6   Eighth Circuit for this terrorism enhancement is that she did
7   voluntarily enter a plea of guilty, that she has accepted
8   responsibility and that she begun that road to rehabilitation
9   and giving her the maximum sentence negates that.  That's a --
10  that's a policy or a -- I don't know -- tradition that we
11  can't just throw out without thought.  We want people to
12  accept responsibility.  We want people to know, Hey, if I
13  commit this crime, yeah, I'm going to get statutory maximum
14  sentence but my plea of coming forward and doing the right
15  thing will be taken into consideration.  That's why I believe
16  that to be a just punishment.

17         Yeah, I know, I have agreed -- the defense did agree
18  and we have -- we do agree that the enhancements under the
19  guidelines apply.  But as a part of our plea agreement, we are
20  free to argue that this Court should vary downward, as the
21  Court has varied downward in all of the examples that I have
22  presented to the Court.  Most of them.  At least all of the
23  enhancements based upon the terrorism enhancement, all of them
24  varied downward.

25         Your Honor -- and I know I brought this up in my

44

sentencing memo, but it bothers me -- it bothers me to no end
that the guideline manufactures the category six.  I would be
more inclined to accept where we have a terrorism enhancement
where the base offense level begins at 43.  At least we're not
making up facts.  We're not creating things.  You're a 43
because it's a very serious crime and that's where we begin
you at, a 43.  You're at the maximum allowable.

But here, unlike armed career criminal and unlike
career offender, there's just no relationship between what she
has done and a category six.

And I will mention briefly because I know Ms. Mick
mentioned it today in her statement, I know the government
mentioned it a couple times about this threat that she did in
California.  I know the Court may be well aware of it but no
one actually said it and I want to say it today.

It was more than taking a kid.  It was more than
that.  It was she believed that this person was molesting her
child.  And she did say, If you come at me and my daughter
again, I will cut off both your heads.  That was said on the
stand earlier in the detention hearing.  And that's important,
because like Ms. Mick referenced, what mother wouldn't?  Now,
we're not agreeing that that should be done, but if a mother
believes that her child is being molested by another man, that
conduct cannot just be slotted in with all the other, Well,
it's a threat and we can just brand it a threat and be done

45

1    with it.  There's much more to that.

2         The Court did reference this -- I think the United

3    States cases that they do reference do miss the mark.  We are

4    talking about a Class D felony here, 875(c).  The *McNeil* case,

5    the *Ali* case, they are not more than 20.  And they do --

6    McNeil himself had five counts of solicitation to commit a

7    crime of violence on top of five counts of 875(c).  And Ali

8    the same.  This providing a material support is not more than

9    20.  These are higher grades of offenses.

10        And so, yes, I believe that this Court should look

11   to 875(c) offenses as a guideline ruler as to what type of

12   sentence are people getting.  And what we have presented to

13   this Court is a higher-than-normal sentence for an 875(c).

14   Because like I -- I think I mentioned, Safya's not a fool.

15   She knows that this case is different than a -- than a run of

16   the mill.  There are factors here that go beyond a regular

17   875(c).  So asking for 15 months in jail or 24 months in jail

18   and that's it is not going to work, so we have recognized that

19   and we have built that into this sentencing suggestion, Your

20   Honor.

21        Very briefly, yes, I did not object to restitution.

22   If there's restitution to be had, Safya will gladly pay it.  I

23   did have concerns about what was provable, what documents the

24   government would provide, itemized lists, this is how much

25   they spent.  And, like the Court mentioned, what was the

46

timetable of these threats?  Would these people have spent

this money whether or not Safya would have done her criminal

act?  Those were the concerns I had, but ultimately my more

focus is on the detention issue and the incarceration, so I

leave that judgment regarding restitution completely up to the

Court.

Your Honor, for these reasons -- I have actually run

through my points here.  For these reasons I am going to ask

for the sentence that I've outlined in the sentencing

memorandum.  Thank you.

THE COURT:  Does your client wish to make a

statement of allocution?  You can do it right from your seat

there.

MR. LEWIS:  She has issues standing.

THE COURT:  You can remain seated if it hurts you to

stand up, that's fine.  Just make sure the microphone picks up

what you say.

THE DEFENDANT:  Okay.  I was going to prepare a

speech and everything, write one out, but I don't -- I don't

think it sounds filling, it sounds more robotic, so I'm just

going to say how I'm feeling.

I started off on the internet to do activism and

like an advocacy for my children, for special needs kids, and

to connect with other mothers that had special needs kids and

it went into anti-war and from there I really veered off and I

47

1  don't think it seemed real, like more disconnected.  Like I
2  don't even think at the time about the victims and the fear
3  that they might have felt.  And now I understand it, because
4  if it was my children, I'd be scared for my children.  And for
5  that I'm really sorry to their families.  I realize that I
6  caused them fear.

7          And I never realized, really truly that my retweets
8  would be so much harm to people in the real world.  It's a
9  different scene online.  It's not real almost.  It doesn't
10 feel real.

11         I have this special needs son, as you know, and he
12 needs me.  I have a young daughter that needs me.  And I will
13 never be on social media again.  If I could veer off so
14 easily, I don't want to be on it.  I would never be on it.  In
15 fact, I don't know if I would ever be on the internet for
16 email.  I just -- I want to stay away from it so I don't get
17 in this kind of trouble or cause other people trouble like
18 this.

19         And the whole experience has changed my way off
20 thinking and I realize what's more important is my children,
21 my family.  I'd like to get proper medical care, emotional
22 care so that I can cope with life and take care of my children
23 properly.  And -- I'm nervous.  I'm sorry.  I'm just -- I'm
24 remorseful for what I've done.  I hope you take that into
25 consideration.

Case 6:16-cr-03024-MDH   Document 136   Filed 06/28/19   Page 48 of 63

1            That's it.  Thank you.

2            THE COURT:  All right.  Let me –– I'm going to ask

3    you a question.  You don't have to answer, consult with your

4    lawyer.  Obviously the –– some of the things you retweeted put

5    people in jeopardy but you also said some things –– and I'm

6    going to the related conduct now, not the exact crime you're

7    charged with here –– expressing frustration that there wasn't

8    more violence against the Jewish people who lived in our

9    country and that Muslim men living in the United States should

10   be more violent and that you could tell them where all these

11   Jewish men were.  Is that a philosophy you still hold, that

12   Jewish people should be subject to violence?

13           THE DEFENDANT:  No, absolutely not.  I ––

14           THE COURT:  Is that a product of your religion?  Is

15   that a product of somebody influencing you?  Where did that

16   come from in your tweets?

17           THE DEFENDANT:  It wasn't a tweet.  It was like a

18   personal conversation with some girl.

19           THE COURT:  You're right, it was a conversation.

20           THE DEFENDANT:  And it was –– it was more like a

21   showing off, in reality.

22           THE COURT:  Was the person you were having that

23   conversation with an active anti-Jewish group or anti –– did

24   she have strongly anti-Semitic beliefs?

25           THE DEFENDANT:  I'm assuming so.

                                 49

1          THE COURT:  Were you trying to impress her, is
2   that --
3          THE DEFENDANT:  Kind of, yeah.
4          THE COURT:  Anything else anybody wants to say
5   before I make a final decision?
6          MR. LEWIS:  Not from the defense, Your Honor.
7          May I remain seated with my client?
8          THE COURT:  If she's going to remain seated, you
9   can, then everybody can stay seated, if it hurts her back.
10          Anything further from the government?
11          MR. CASEY:  Not from the United States, Your Honor.
12          PROBATION OFFICER:  Your Honor, would you like to
13   see the documentation that the probation office received
14   regarding the restitution requests?
15          THE COURT:  I'll tell you what I'm going to do.  I'm
16   going to order a restitution judgment to be submitted and with
17   it the supporting material at that time, then we can deal with
18   that later rather than me trying to go through it right now.
19          Is that all right with you guys?
20          MR. CASEY:  Yes, Judge.
21          MR. LEWIS:  Yes, Your Honor, that's fine.
22          THE COURT:  I can make a calculation based on
23   everything I get, then what I think the restitution amount may
24   be.  It may well be what you asked for but I at least want to
25   see some supporting documentation.

1          Ms. Yassin, as may have been obvious by some of the
2     questions, I was rough on the U.S. government and that's
3     because I want to make sure that as a country we are being
4     fair to people who have different political beliefs and who
5     want to use social media to share those beliefs.  And I
6     frankly -- what the offense here and I want us to focus on is
7     the threats of violence.  That is what is a crime and should
8     be a crime.  And as broad protection as I believe the First
9     Amendment is entitled to and has, there's no room for threats
10    of violence or encouraging violence within those First
11    Amendment protections.
12          I admit that I struggle somewhat with the going to
13    level six on the criminal history -- although that is the law
14    and certainly understand that -- as to terrorist organizations
15    because I think there is a widespread threat to our country by
16    threats of violence that have nothing to do with terrorist
17    organizations.  That may well be a greater threat to our
18    country.  I mentioned white supremacists.  There are radical
19    organizations on both sides, there are criminal gangs, all of
20    who use violence and threaten violence rather than logic or
21    persuasion or justice to win.
22          And unfortunately what's happened in the most recent
23    times is now our political rhetoric has gotten on the edge of
24    threatened violence which is the most destabilizing thing, I
25    think, that could happen in this country.  The fact that our

1  elections have always been based on the rule of law is what
2  has made this country special and now that we have groups
3  threatening people who disagree with them with physical harm
4  or injury, that threatens that rule of law.

5      I want to assure you that -- you probably aren't
6  going to like whatever sentence I give you, I understand from
7  your perspective, because I'm not going to do what your lawyer
8  wants me to do.  But I do want to assure you that your
9  punishment has nothing to do with your religious belief or for
10  that matter your political belief except to the extent that it
11  would include use of violence.

12      If ISIS's premise is that we should use violence
13  against the United States, that's not acceptable.  And to the
14  extent that you have facilitated and aided and abetted them
15  spreading messages of violence, that's not acceptable.  That's
16  a crime and it should be punished.

17      If you had a different political philosophy or
18  religion and you were advocating use of violence against
19  others in this country, I'd be inclined to give you the same
20  sentence.  And a lot of my questions and my concern about this
21  case is I wanted to make sure that we focused on the violence
22  and that we focused on your role.

23      Honestly, I scratch my head.  Why would a mother
24  who's busy with her kids -- understand advocating for your
25  kids on the internet, I could even understand advocating for

52

1   your religion on the internet, advertising personal
2   information about people you don't know and encouraging
3   violence against them, I can't understand.  I can't justify.
4   There is no excuse under the law regardless of what you did.

5          And had you done it about an ex-boyfriend or a
6   teacher you didn't like who gave you a grade you didn't like
7   or the cab driver who you got mad at or the store clerk that
8   you thought was rude to you, for whatever reason advocating
9   violence against them and relaying their personal information
10  is not acceptable.  It's contrary to the rule of law we
11  believe in in this country.

12         I do recognize, as the government has argued, that
13  when the people your violent threats are against are those
14  very people whose job it is to keep our country safe, then the
15  impact of the violence is more than just the intrusion into a
16  personal family and personal family safety but could actually
17  threaten the stability of our country in multiple ways, one by
18  us losing precious protectors and also in making it harder to
19  recruit people to take the position of protectors of our
20  country and our laws.

21         I can't especially understand why, having been
22  contacted by the FBI, and I think a fair statement is being
23  less than forthcoming -- that's probably maybe an
24  understatement, but at least less than forthcoming with the
25  FBI about your role, knowing that the FBI was investigating

Case 6:16-cr-03024-MDH   Document 136   Filed 06/28/19   Page 53 of 63

1 and concerned and then continuing the behavior shows either a

2 dangerous lack of judgment and naivete or that you are indeed

3 a danger and that you were intentionally wanting to put people

4 at risk for violence that you intentionally wanted to get

5 harmed.

6 I will tell you from the first time I opened this

7 case and read it and studied it I got the impression that you

8 liked the attention and being a big deal and with all these

9 people following you, you liked being a big deal and that you

10 did whatever got you attention and made you a bigger deal.

11 Don't know if that's really what your motivation was, but I

12 will tell you that's a lot more innocent motivation I gave you

13 than what it could be, and that is that you intentionally

14 wanted to harm people. But even that motivation wouldn't

15 justify what you did. It would be evidence that you do need

16 help.

17 So finding the perfect sentence for you is

18 difficult. I am frustrated that they decided to go to

19 criminal history six immediately, but you do seem to either

20 have a temper or bad judgment in your willingness to become

21 angry and make a threat of violence. While I don't -- I

22 understand why someone would make a threat of violence against

23 someone they thought had abused their child, the fact that you

24 were convicted gives me concerns that maybe there was no

25 justification for those threats and that maybe instead of

54

1    reason and working out and respecting the court of law and

2    going to court and getting justice, your response to get your

3    way is to be violent.  That is why that one prior incident may

4    be relevant to me.

5              And while I looked at the criminal history

6    sentencing and even if you were a criminal history one, which

7    means I don't give credit to that bumping you to six under the

8    guidelines, with an offense level of 31 your sentence would be

9    between 108 and 135 months.  As I told you earlier, and I mean

10   it, the law says you go to six.  So in terms of using the

11   guideline, that's what we have to go.  But even if you only

12   had a criminal history of one, which is the lowest possible,

13   you still would be facing a sentence of 108 months to 135

14   months.  That is largely due to the enhancements on the

15   offense level contained in the -- as reflected in the

16   presentence investigation report and, again, because of

17   terrorism and the enhancements related to that.

18             So in looking at your offense level, I then say what

19   would your offense level be if it wasn't a terrorist threat?

20   And your lawyer has very capably pointed out that you'd be

21   facing a lower sentence with numerous cases he cited but none

22   of them are terrorists.  None of them threatened the essence

23   or security of our government nor military or law enforcement

24   officers.

25             I am more willing to give a higher sentence frankly

55

1  because of those things than I am just because someone has

2  designated one organization a terrorist organization and

3  failed to get around to designating another organization a

4  terrorist organization, because as I said earlier, I think

5  there are domestic organizations that presently are about the

6  same threat as we are as foreign terrorist organizations but

7  we don't ever get around to designating them in the same way.

8         Your lawyer's argument that by pleading guilty you

9  should get some benefit, frankly, what both lawyers argued on

10 that is absolutely correct.  The plea agreement itself

11 certainly provides benefit for you.  Had you been found guilty

12 of those other offenses, you'd be facing a potentially higher

13 sentence.

14        On the same hand, by pleading guilty you did save

15 the government some work and, frankly, a potentially lengthy

16 and difficult trial involving classified information of our

17 country.  Now, since the terrorist has now been killed, it may

18 not be the same but it certainly would have been potentially

19 difficult.  And I do think it's appropriate that you pled

20 guilty if you are guilty and I do -- I'm usually inclined to

21 give -- Mr. Lewis knows this -- a little bit of a benefit for

22 that.  Not always but usually.

23        Based on all these factors -- and let me say I also

24 recognize you had a very difficult childhood and have had a

25 difficult life.  That doesn't justify threats of violence

                              56

1    against other people, though.  Your aunt talked articulately

2    about good things that you've done for other people.  I

3    believe that, because the people in front of me aren't all bad

4    or all good.  For that matter, I would expect that the

5    terrorists who were the most egregious in ISIS probably do

6    good things for their family.  I don't doubt that you do good

7    things for those that are close to you or those you care about

8    and that you have the ability to be a good person and do good

9    things.  Unfortunately, that's not why you're here.

10          Here's what I'm going to do.  After hearing all the

11   argument, considering all the factors, even those I may not

12   have specifically mentioned, I've considered all the

13   sentencing factors.

14          Pursuant to the Sentencing Reform Act of 1984, it's

15   the judgment of this Court that defendant Safya Roe Yassin is

16   hereby committed to the custody of the Bureau of Prisons for

17   60 months on Count 2 and 48 months on Count 3, the terms to be

18   served consecutively for a total imprisonment of 108 months.

19   Upon release from imprisonment the defendant will be placed on

20   supervised release for three years.  That's three years on

21   each of the counts to run concurrently.  I'm not going to

22   impose a fine.  You do have to pay a $200 special assessment;

23   that's $100 per felony count.

24          I do intend to impose restitution, the amount of

25   which will be determined after submissions by the government

57

1   of a proposed restitution judgment with supporting documents.

2   The defendant will be afforded an opportunity to challenge the

3   amount of restitution through briefing or otherwise if they

4   believe it's incorrect.

5           For the record, the government has asked for

6   restitution in the amount of $20,034.91.  I do want

7   information not just about the cost that these victims have

8   incurred -- because I do think they're entitled to

9   restitution -- but if someone else has ordered and paid toward

10  that amount, I think I should know that.  Those may be two

11  different things.  So if they've been ordered, you might just

12  want to tell me that and then I can make part of the

13  restitution judgment joint and several.

14          Would that be okay?

15          MR. CASEY:  That is, Your Honor.  Mr. McGull had to

16  step out for another matter.

17          Actually looked up the *McNeil* case while we were

18  speaking.  Restitution at this point is stayed, I believe,

19  pending appeal on that case.  We'll need to see where they're

20  going to go with that.

21          THE COURT:  Just submit the information about what

22  the status of everything is and we'll do what we can.

23          MR. CASEY:  I'll have all that information for the

24  Court.  Thank you, Your Honor.

25          THE COURT:  While you're on supervised release you

58

will comply with the mandatory and standard conditions that
have been adopted by the Court.  The defendant shall comply
with the special conditions listed in Part D of the
presentence investigation report.

Those conditions are in your report but they're
going to include you're not going to be around a computer or
social media during your period of supervised release.  And
let me make it clear -- this is a condition we use in other
cases -- that's not a condition you should think that you
could violate and not end up back in prison.  If you're around
a computer in violation of your conditions of release, I will
consider that to be a very serious violation because you tried
to do harm with your social media even if it didn't end up
happening.  There will be other conditions of your supervised
release you'll have to follow and violating them could end up
sending you back to prison, too, but that is one that would be
considerably difficult for me to accept.

You have a right to appeal my sentence if you
believe that it's improper or illegal in some way.  To the
extent you preserved that right in your plea agreement, you
have a right to appeal to a higher Court in the Eighth
Circuit.  You need to do so within 14 days or you risk losing
the right to raise certain issues.

Do you understand your right to appeal?

THE DEFENDANT:  Yes.

59

```
 1            THE COURT:  All right.  Is there any recommendation
 2     about location, Mr. Lewis?
 3            MR. LEWIS:  Your Honor, I'd ask that the Court
 4     recommend a BOP as close to southwest Missouri as possible.
 5            THE COURT:  We will do so.
 6            Government has counts to dismiss?
 7            MR. CASEY:  Yes, Your Honor.  Government moves to
 8     dismiss Count 1.
 9            THE COURT:  It will be dismissed.
10            MR. LEWIS:  Your Honor, actually my client did -- I
11     would like a medical facility for my client's medical issues.
12     We'd ask that you recommend a medical facility for women
13     within the Bureau of Prisons.
14            THE COURT:  I'll do that.  Obviously you know they
15     make their own assessment.  They decide where you go.  But I
16     do know she has significant orthopedic issues, so we'll make
17     that recommendation, see what the Bureau of Prisons does with
18     it.
19            MR. LEWIS:  Thank you, Your Honor.
20            THE COURT:  Let me make sure the record is clear.
21     The reason I'm not giving you the maximum on the second, the
22     government's right, the guidelines are there.  If it wasn't
23     for the maximum, you'd be going higher.  But I do think the
24     fact that you did choose to plead is significant.  The
25     government's avoided the cost and expense of a trial.  And I
```

do think it's significant that you sound remorseful to me. I
think you've -- if what you did was out of naivete or a desire
for attention, I think this punishment is more than enough to
send that message. I do think that between this penalty and
your loss of your computer, you are deterred from similar
behavior. And I do think others -- I understand the
government, we want to deter other people from similar
behavior and I don't think the difference between 120 and 108
months to a person out there is that different. I think they
would be deterred by a 108-month sentence, too. That's the
reason I got to the number I did.

        Anything further from either side?

        MR. LEWIS: No, Your Honor. Thank you.

        MR. CASEY: Not from the United States, Your Honor.

        THE COURT: How long do you need for that
restitution judgment? Can you do it in the next couple weeks?

        MR. CASEY: I believe so, yes, sir.

        THE COURT: Would you or Mr. McGull consult with
Mr. Lewis in advance, see if you can agree on something before
you send it in?

        MR. CASEY: Absolutely, Your Honor. And I apologize
to the Court about the --

        THE COURT: Actually, I probably have enough I could
do it but I kind of like to use restitution judgments. It
lets me give some thought to things. All right?

Case 6:16-cr-03024-MDH   Document 136   Filed 06/28/19   Page 61 of 63

1             MR. CASEY:  Absolutely.

2             THE COURT:  We'll be in recess.

3             (Court stands in recess at 11:04 a.m.)

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2        I, Jeannine M. Rankin, Federal Official Court Reporter,

 3   in and for the United States District Court for the Western

 4   District of Missouri, Southern Division, do hereby certify

 5   that the foregoing is a true and correct transcript of the

 6   stenographically reported proceedings.

 7

 8

 9

10

11                          /s/ Jeannine M. Rankin

12   Date:      06/28/19      Jeannine M. Rankin, CCR, CSR, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25
```