IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 16-03024-01-CR-MDH |
| SAFYA ROE YASSIN, | |
| Defendant. | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S PRO SE MOTION TO REDUCE SENTENCE
PURSUANT 18 U.S.C. §3582(C)(1)(a)(i), AND U.S.S.G. § 1B1.13(C) AND (D) –
COMPASSIONATE RELEASE**

The United States of America, through Timothy Garrison, United States Attorney for the Western District of Missouri, and the undersigned attorney, provides the following response in opposition to defendant's motion for compassionate release. The defendant seeks to have her 108-month sentence for two counts of aiding and abetting in the transmission of interstate threatening communications reduced to time served based upon extraordinary and compelling reasons. The defendant argues extraordinary and compelling reasons exist because of her debilitating medical condition makes her prone to illness and infections thus making her more susceptible to the coronavirus (COVID-19) if the defendant remains in United States Bureau of Prisons (BOP) custody. The defendant is temporarily housed in the Greene County Detention Center in order to address her Section 2255 motion of ineffective assistance of counsel (D.E. 137, p. 1)).[1] Because the defendant has not exhausted her administrative remedies, and has not demonstrated

---

[1] "D.E." is a reference to District Court Entry in case number 16-03024-01-CR-MDH.

extraordinary and compelling reasons justifying a sentence reduction, the Government opposes the request and asks the Court to deny the defendant's motion at this time.

### I.  Procedural History

On July 19, 2016, a grand jury in the Western District of Missouri returned a superseding indictment charging Yassin with, *inter alia*, two counts of making interstate threatening communications, in violation of 18 U.S.C. §§ 875(c) and 2. (D.E. 73.)

On February 29, 2018, Yassin appeared before this Court and pleaded guilty to the two charges of making interstate threatening communications, pursuant to a plea agreement with the Government. (D.E. 119, 120.)

On June 7, 2018, Yassin appeared for sentencing. (D.E. 126.)  After extensive arguments by the Government and the Defendant's attorney, the Court sentenced the defendant to 108 months in BOP (60 months on Count 2 and 48 months on Count 3 said time to run consecutive to each other) followed by 3 years of supervised release (D.E. 127.))

Based on the information made available on the Bureau of Prisons Inmate Locator, the defendant's release date is October 19, 2023. (*See* https://www.bop.gov/inmateloc/.)

On April 3, 2020, the defendant filed a motion for compassionate release and asserts that the current situation regarding the coronavirus (COVID-19) places the defendant at risk if she remains in custody. (D.E. 137.)  Prior to this request, the defendant admitted in her petition she has not filed a request for compassionate release with the warden at Federal Correctional Institution Aliceville (D.E. 137, p. 4.)

### II. First Step Act

Under the First Step Act, Congress provided inmates the ability to file a motion for compassionate release, an ability previously only vested in the United States Bureau of Prisons

2

(BOP). Granting such a motion, however, requires a court to find that "extraordinary and compelling" circumstances justify release from prison or that some other criteria for release has been met.

Under 18 U.S.C. § 3582(c) a court may not modify a term of imprisonment once it has been imposed except that, under subsection § 3582(c)(1)(A), a court may reduce a term of imprisonment upon finding "extraordinary and compelling reasons," if such reduction is consistent with applicable policy statements of the Sentencing Commission, after considering the factors set forth in 18 U.S.C. § 3553(a), and after determining the defendant is not a danger to the community as provided in 18 U.S.C. § 3142(g). (U.S.S.G. § 1B1.13(2).) The pertinent policy statement, U.S.S.G. § 1B1.13, defines specific medical, age, and family circumstances as possibly justifying a sentencing reduction under this statute, and further authorizes a sentencing reduction based on an extraordinary and compelling circumstance identified by the BOP. (§1B1.13 Commentary n.1(D).)

The statute, 18 U.S.C. §3582(c)(1)(A), adopted as part of the Sentencing Reform Act of 1984, originally permitted judicial relief only upon a motion by the Director of the BOP. The provision was amended by Section 606(b) of the First Step Act, effective December 21, 2018. As amended, the court may now act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

As the proponent of a motion, the inmate bears the burden of proving both that they have satisfied the procedural prerequisites for judicial review—*i.e.*, that they have "exhausted all

3

administrative rights to appeal a failure of the [BOP] to bring a motion on [her] behalf" or that 30 days have lapsed "from the receipt of such a request by the warden"—and that "extraordinary and compelling reasons" exist to support the motion. 18 U.S.C. § 3582(c)(1)(A); *see United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

The defendant, by her own admission in her request, admitted that "[she] has not asked her Warden at FCI Aliceville for a compassionate release since she is not technically in BOP custody at this time." One of the conditional precedents for a defendant seeking compassionate relief is to "fully exhaust[ ] all administrative rights." § 3582(c)(1)(A). Until such time, this Court should refrain from reviewing defendant's request. *United States v. Clark*, CR 17-85-SDD-RLB, 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020) (holding that the defendant failed to comply with the exhaustion requirements under the statute; therefore, the motion for compassionate relief is not ripe for review.)

### III. <u>The Defendant Has Failed To Exhaust Administrative Remedies</u>

This Court lacks authority to act on the defendant's motion for compassionate release at this time. The statute requires that a request for compassionate release be presented first to the Bureau of Prisons for its consideration; only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the Bureau's failure to move on the defendant's behalf, may a defendant move for compassionate release in court. That restriction is mandatory, and it continues to serve an important function during the present crisis. The Government is very

4

mindful of the concerns created by COVID-19, and BOP is making its best effort both to protect the inmate population and to address the unique circumstances of individual inmates.

The compassionate release statute provides, in pertinent part:

> The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .

18 U.S.C. § 3582(c)(1)(A). Contrary to the defendant's assertion, the requirement that a defendant either exhaust administrative appeals or wait 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court.

The Third Circuit very recently held that a defendant seeking COVID-19 compassionate release must meet the 30-day exhaustion requirement with BOP:

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like [defendant]. But the mere existence of COVID-19 in society and the possibility that it might spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance. And given the Attorney General's directive that BOP "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," we anticipate that the exhaustion requirement will be speedily dispatched in cases like this one.

*United States v. Raia*, 2020 WL — (3d Cir. Apr. 2, 2020) (citations omitted).

In *United States v. Gileno*, 2020 WL 1307108 (D.Conn. Mar. 19, 2020) the District Court rejected a defendant's attempt to reduce his prison sentence to home confinement based on increased risk of contracting COVID-19 due to his mental and health conditions because he failed

5

satisfy the requirements under 18 U.S.C. § 3582(c)(1)(A). The District Court stated, "[a]s a threshold matter, Mr. Gileno has not satisfied the requirement under 18 U.S.C. § 3582(c)(1)(A) to first request that the Bureau of Prisons file a motion on his behalf and then show that thirty days have passed without any BOP action. As a result, the Court cannot consider his motion to modify his sentence." *Gileno* at *3. At this time, our defendant's motion is premature and a dismissal is appropriate.

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only pursuant to statutory authorization. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Consistent with that principle of finality, Section 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," 18 U.S.C. § 3582(c), except in three circumstances: (1) upon a motion for reduction in sentence under 18 U.S.C. § 3582(c)(1)(A), such as that presented by the defendant; (2) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," 18 U.S.C.

6

§ 3582(c)(1)(B); and (3) where the defendant was sentenced "based on" a retroactively lowered sentencing range, 18 U.S.C. § 3582(c)(2).

Given the plain language and purpose of the statute, the requirements for filing a sentence reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for compassionate release—are properly viewed as jurisdictional. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). Section 3582(c) accordingly has been understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.[2]

_____

[2] A number of courts have recognized that the prerequisites for relief under Section 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, are jurisdictional. *See, e.g.*, *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010); *United States v. Williams*, 607 F.3d 1123, 1125-26 (6th Cir. 2010); *United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993), *overruled on other grounds by United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016); *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012); *United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013); *United States v. Mills*, 613 F.3d 1070, 1078 (11th Cir. 2010); *see also United States v. Higgs*, 504 F.3d 456 (3d Cir. 2007) (canvassing history of judicial treatment of Rule 35 as jurisdictional and holding that Rule 35(a) and Section 3582(c)(1)(B) remain jurisdictional after *Bowles*). Other courts disagree. *See, e.g.*, *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013); *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015).

7

We recognize that, in recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id.* at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that Section 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for compassionate release where the defendant has failed to satisfy the exhaustion requirement of Section 3582(c)(1)(A).[3]

While the Government maintains that the time limitation in Section 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic. Even if the exhaustion requirement of Section 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S. at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14

---

[3] Although we use the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden.

8

days of the verdict, is a nonjurisdictional but mandatory claim-processing rule). The government raises the rule here, and it must be enforced.[4]

The defendant nevertheless may assert the statute can also reasonably be construed to not apply the exhaustion requirement in an obviously futile context such as a national emergency, and that the Court can consider her motion even though less than 30 days have passed since the request was not made to the warden of the defendant's facility. That would be an incorrect assertion.

In this case, the Warden of FCI Aliceville has not had the statutorily mandated 30 days to consider whether the defendant has applied under any cognizable reduction in sentence criteria. While judicially created exhaustion requirements may sometimes be excused, it is well settled that a court may not ignore a statutory command such as that presented in Section 3582(c)(1)(A).

The Supreme Court recently reaffirmed that principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which the Court rejected a judicially created "special circumstances" exception to the exhaustion requirement stated in the Prison Litigation Reform Act of 1995 (PLRA). That Act mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the

---

[4] Indeed, even those courts that have concluded that the requirements of Section 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See, e.g.*, *Taylor*, 778 F.3d at 670 (recognizing that even if a court has the "power to adjudicate" a motion under Section 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

9

exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856. The Court stated:

> No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions. *See McKart v. United States*, 395 U.S. 185, 193 (1969) ("The doctrine of exhaustion of administrative remedies . . . is, like most judicial doctrines, subject to numerous exceptions"). But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.

*Id.* at 1857.

That rule plainly applies to the statutory text here. Section 3582(c)(1)(A) unambiguously permits a motion to the Court only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[5]

The requirement of a 30-day period to afford BOP the initial review of the defendant's request therefore cannot be excused. While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort to administrative remedies. And this is for good reason: The Bureau of Prisons conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, the Bureau of

---

[5] Unlike the exhaustion provision in *Ross*, which required only exhaustion of "available" administrative remedies, 136 S. Ct. at 1858, the compassionate release statute contains no such exception.

Prisons completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

For all of these reasons, BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities. The provision of Section 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. Even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.

This remains true in the present crisis. The Government does not downplay the defendant's concerns in any way. The defendant has filed her motion for compassionate release based on concerns about the coronavirus pandemic, which is addressed further below, however, the defendant is not in a unique position related to other inmates, nor the population at large. Here the defendant has not fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.

### IV. BOP Response to the Coronavirus Pandemic

This Court, like all citizens, is vividly aware that COVID-19 is an illness which has infected large numbers of people and caused many deaths in a short period of time. The BOP has accordingly taken significant measures in an effort to protect the health of the inmates in its charge. The BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter

experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization (WHO). On March 13, 2010, the BOP announced that it was implementing the Coronavirus (COVID 19) Phase Two Action Plan ("Action Plan") in order to minimize the risk of COVID-19 transmission into and inside its facilities. The Action Plan comprises many preventive and mitigation measures, including the following:

**Screening of Inmates and Staff:** All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. (Staff registering a temperature of 100.4 degrees Fahrenheit or higher will be barred from the facility on that basis alone.)

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened using the same procedures as applied to staff prior to entry.

**Quarantine Logistics:** The Action Plan directs all BOP institutions to assess their stockpiles of food, medicines, and sanitation supplies and to establish quarantine areas within their facilities to house any detainees who are found to be infected with or at heightened risk of being infected with coronavirus pursuant to the above-described screening protocol.

**Suspension of Social Visits and Tours:** The BOP has placed a 30-day hold on all social visits, such as visits from friends and family, to limit the number of people entering the facility

12

and interacting with detainees. This suspension will be reevaluated at the end of the 30 days. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended for at least the first 30 days that the Action Plan is in effect.

**Suspension of Legal Visits:** The BOP has also placed a 30-day hold on legal visits at which time the suspension will be reevaluated. Case-by-case approval for legal visits, after the attorney has been screened for infection in accordance with the screening protocols for prison staff, and confidential legal calls will be allowed in order to ensure access to counsel.

**Suspension of Inmate Movements:** The BOP has also ceased the movement of inmates and detainees among its facilities for at least the first 30 days that the Action Plan is in effect. Though there will be exceptions for medical treatment and similar exigencies, this will prevent transmissions between institutional populations. Likewise, all official staff travel has been cancelled, as has most staff training.

**Modified Operations:** Finally, the Action Plan requires wardens at BOP facilities to modify operations in order to maximize social distancing. Among the possible actions are staggering of meal times and recreation time.

Further details regarding the efforts made by the BOP to confront the issues presented by COVID-19 are available at: https://www.bop.gov/resources/news/20200313_covid-19.jsp, and at a daily updated resource page: https://www.bop.gov/coronavirus/index.jsp.[6]

---

[6] According to the resource page, due to the rapidly evolving nature of this public health crisis, the BOP will update the dashboard daily at 3:00 p.m. based on the most recently available data from across the agency as reported by the BOP's Office of Occupational Health and Safety.

Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution. BOP professionals will continue to monitor this situation and adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have nevertheless become ill, and more likely will in the weeks ahead. But the solution is not to exclude BOP from reviewing applications for compassionate release. There are many challenging factors to consider during this unprecedented pandemic, and the BOP should have the opportunity to assess those factors during the statutorily required review period. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced if any service), and of supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

In addition, the BOP has been granted wider authority to designate inmates for home confinement in its toolkit of available measures. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during

14

the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Further, Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted on March 27, 2020, permits the BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau of Prisons, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

Even though the Government has asked the Court to dismiss the defendant's motion, the Government is sensitive to the issues the defendant raises related to the coronavirus pandemic. The Government does not minimize the concern or the risk to inmates such as the defendant. At the present time, the BOP has taken aggressive action to mitigate the danger. If the situation changes, it will take action to attempt to protect all inmates, including those who may be more susceptible to adverse results due to age and existing ailments.

In this case, although the defendant expresses concern for her health related to the coronavirus pandemic, the defendant does not allege she is in a category due to age or preexisting medical condition that places her in a high risk category that would establish an extraordinary or compelling reason for a sentence reduction.  She has alleged, among other things, that her cauda equine syndrome requires her to self-catheterize at least five times per day.  The defendant has been performing this procedure without any alleged issue or at least she has not mentioned any in her request for compassionate release.

She has also alleged that she is a federally declared "medical convalescence" (D.E. 137, p. 2)  and that somehow she would be a help to her 66 year old father that is caring for her two minor

15

children one of which "suffers from severe autism" (D.E. 137, p. 3.) The Government fails to see how her release would lessen the burden on her father who would have to care for her two minor children along with the "permanently disabled" defendant who list her debilitating medical conditions such as kidney stones, muscle atrophy, severe back pain, leg and feet numbness that "mak[es] it difficult for her to get around" (D.E. 137, p. 1.)

## V. **The Defendant has Not Identified Extraordinary and Compelling Reasons**

The Sentencing Commission's pertinent policy statement related to extraordinary or compelling reasons appears at U.S.S.G. § 1B1.13. As amended November 1, 2018, the statement repeats the text of 18 U.S.C. § 3582(c)(1)(A) and adds that the court should reduce the sentence only if the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The BOP promulgated Program Statement 5050.50, amended effective January 17, 2019, to set forth its own internal criteria for evaluating compassionate release requests. Courts have frequently upheld the BOP's discretionary authority in its management duties over federal prisoners. *See Tapia v. United States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary control, subject to statutory constraints, over [the place of imprisonment and treatment programs].").

The defendant has alleged that the self-catheterization she performs upon herself up to five (5) times per day makes her vulnerable to infections and that self-procedure may make her susceptible to infections in light of the COVID-19 virus. The correlation between her obtaining a remote infection and COVID-19 is speculative at best. However, her superficial condition is not one addressed in U.S.S.G. § 1B1.13.

The application notes for U.S.S.G. 1B1.13 define medical condition of the defendant as:

16

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is--

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(U.S.S.G. § 1B1.13 Application Note 1(A).)

In this case, the 42 year old defendant has alleged kidney stones, muscle atrophy, severe back pain and self-catheterization make her more susceptible to COVID-19 (D.E. 137, p. 1-2.) The defendant assertions are an inadequate showing of extraordinary and compelling circumstances. There is no evidence or claim that she is unable to provide self-care. In fact, she readily admits to performing her own catheterization. The defendant has failed to sustain her burden to prove that she meets the requirements for compassionate release or a reduction of sentence. The defendant does not have a terminal illness/suffer from any physical or mental condition that substantially diminishes her ability to provide self-care within the correctional facility. There are no extraordinary and compelling reasons, as those terms are defined for the purpose of 18 U.S.C. § 3582(c)(1)(A), justifying compassionate release or any form of sentence reduction in this case.

The defendant argues her medical condition places the defendant at an increased risk should the defendant contract the coronavirus. (D.E. 137, p. 1-3.) Unfortunately, the defendant's

17

circumstance is not extraordinary in the context that many individual across the nation are in the same or similar position as the defendant, and the defendant's medical condition remains the same whether she is released. While the Government is attune to the difficulties facing inmates, this particular instance simply fails to meet the requirements of the law and policy. In *Dillon v. United States*, 560 U.S. 817, 826, (2010) the Supreme Court determined that the sentencing court could only consider a reduction in sentencing if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. Based on that reasoning, U.S.S.G. § 1B1.13 Application Note 1(A) is mandatory and the defendant's request does not meet the requirements for release.

The defendant has also alleged that her family circumstance qualifies her for a compassionate release because her 66 year old father that is caring for two minor children (The autistic 17 year old and a 15 year old.) She indicated that her father who has been the primary caretaker of her two children for the last four years needs her help but she has not alleged any new family circumstance to warrant her release.

The application notes for U.S.S.G. 1B1.13 define family circumstances as:

> **Family Circumstances.--**
>
> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(U.S.S.G. § 1B1.13 Application Note 1(C).)

In this instance, the defendant's family circumstances have not changed for the four years she has been absent from the home. She did not allege in her petition how the caregiver services of her father to her children has changed. Moreover, in the defendant's medical debilitating

18

condition, it does not appear releasing her to her father's home would lessen her father's care giver role but may increase it. Not only would her father have the responsibility of taking care of her two children, but he would have the additional duty of taking care of the defendant with her physical limitations of kidney stones, numbness, and "severe middle back pain that requires her to lay down for large portions of the day" (D.E. 137, p. 2). The defendant's argument does not meet the existence of a family circumstance as set forth in the Commission's policy statement.

Unfortunately, the defendant's circumstance is not extraordinary in the context that many families across the nation are experiencing similar difficulties related to quarantines, school closures, and stay-at-home orders. While the Government is attune to the difficulties facing families of inmates, this particular instance simply fails to meet the requirements of the law and policy. In *Dillon v. United States*, 560 U.S. 817, 826, (2010) the Supreme Court determined that the sentencing court could only consider a reduction in sentencing if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. Based on that reasoning, U.S.S.G. § 1B1.13 Application Note 1(C) is mandatory and the defendant's request does not meet the requirements for release.

The defendant appears to have asserted other reasons for her release related to her temporary incarceration at the Greene County Justice Center which she claims as being over crowded that makes her vulnerable to the COVID-19 virus.

The application notes for U.S.S.G. 1B1.13 define other reasons as:

**Other Reasons**.--

As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

(U.S.S.G. § 1B1.13 Application Note 1(D).)

19

Here, the defendant has not argued she is at higher risk of getting sick or dying from COVID-19 based on her age or an underlying health condition such as heart disease, diabetes, or lung disease. *See* https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.

The defendant's motion, however, does not address the measures that BOP and other detention facilities are undertaking to prevent any spread, including suspension of social visitation, internal inmate movements, legal visits, official staff travel, training, access by volunteers and many contractors; extensive screening of staff and inmates (including screening of all new inmates); quarantine; and modified operations to maximize social distancing as much as practicable, as set out above.

Given that no persons will be admitted to BOP facilities without being screened for symptoms and risk of infection, the risk that the defendant will be infected simply as a result of incarceration is not necessarily higher than her risk of infection upon release. The defendant has not provided evidence that she will be less likely to contract the coronavirus if released. Based on this record, there is no evidence than BOP custody in general or custody at FCI Aliceville or Greene County Justice Center in particular puts the defendant at greater risk of contracting the coronavirus as compared to the general population in the United States.

Although our nation in the midst of a national crisis requiring extraordinary measures, § 3582 contemplates compassionate release, not the widespread release of inmates serving lawfully-imposed sentences.

20

### VI. Rehabilitation is Not an Extraordinary and Compelling Reason

Finally, the defendant asserts she has demonstrated a record of rehabilitation. The Government has no way to verify her alleged accomplishments in BOP, as she listed in her motion (D.E. 137, p. 4-5), which are laudable. However, rehabilitation of a defendant is not, by itself, an extraordinary and compelling reason for a reduction of a term of imprisonment. (U.S.S.G. § 1B1.13 Commentary n.3; 28 U.S.C. § 944(t).)

It appears that these accomplishments that the defendant asserts without evidence would be better evaluated by BOP that interacts with the defendant on a daily basis. BOP or the warden at FCI Aliceville would be in a better position to evaluate the defendant's rehabilitation and re-entry into society than the District Court. However, as noted in her petition for compassionate release, she has not asked her warden at FCI Aliceville, an individual and staff that are in a much better position to evaluate the defendant's success for compassionate release.

### CONCLUSION

Based on the foregoing, the Government respectfully requests that the motion be dismissed until such time that the defendant exhausts her administrative remedies, or demonstrates an extraordinary and compelling reason for a release.

Respectfully submitted this 9th day of April, 2020.

Timothy A. Garrison
United States Attorney

*/s/*

Abram McGull II
Assistant United States Attorney

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on April 9, 2020, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record and defendant at:

Safya Roe Yassin - 2955272
Greene County Justice Center
1000 N. Boonville Avenue
Springfield, MO 65802

/s/_____
Abram McGull II
Assistant United States Attorney

22